**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FREDDY PAZ PEREZ, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>C.R. CALDERON CONSTRUCTION, INC.,<br>*et al.*,<br><br>Defendants. | Civil Action No. 12-697 (BAH)<br><br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION SETTING FORTH**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Thirteen construction workers bring this action against a first-tier subcontractor and its

owners, C.R. Calderon Construction, Inc. ("CRC"), Carlos R. Calderon and Ana P. Calderon

(collectively, the "CRC defendants"), a second-tier subcontractor and its owner, Jacinto

Construction, Inc. ("JCI") and Jacinto E. Cespedes ("Jacinto Cespedes") (collectively, the "JCI

defendants"), and a company which served as a surety on a payment bond with CRC, Travelers

Casualty and Surety Company of America ("Travelers"), for alleged violations of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the District of Columbia Wage Payment and

Collection Act ("DCWPCA"), D.C. Code § 32-1301 *et seq.*, and the District of Columbia

Minimum Wage Revision Act ("DCMWRA"), D.C. Code § 32-1001 *et seq.*, and for common-

law breach of contract.[1]  The plaintiffs seek the payment of wages they claim are owed in

connection with drywall, ceiling and other work they performed on a construction project at the

H. Carl Moultrie Courthouse in Washington, D.C (the "Project").  The defendant CRC has

---

[1] The plaintiffs are Freddy Paz Perez, Gerardo Moya, Jose Ramiro Perez, Mario Moya, Juan Amurio Quiroz, Peter Soto, Samuel Lopez, Wilson Perez Zapata, Luis Rocha Moya, Edgardo Pablo Terceros, Jose Rocha Cespedes, Jose Lenin Rocha Quiroz, and Javier Cespedes Becerra.

asserted cross-claims for indemnification and breach of contract against the JCI defendants, and the JCI defendants, likewise, have asserted cross-claims for contribution and breach of contract against the CRC defendants.  Following a bench trial, the Court concludes that the JCI and CRC defendants were plaintiffs' employers under the relevant statutes and are liable to plaintiffs for unpaid wages and statutory liquidated damages, and that Travelers is liable to the extent of its surety bond with CRC.  Finally, since the Court declines to enforce the subcontracts between CRC and JCI, the various cross-claims among the CRC and JCI defendants are denied.  The factual and legal findings supporting these conclusions are summarized after review of the procedural background in this case.

## I.      PROCEDURAL BACKGROUND

The plaintiffs' allegations as well as significant issues raised and either resolved or deferred in pre-trial motions are summarized below.

### A.      CLAIMS

The plaintiffs' operative complaint in this action, Pls.' First Amended Compl. ("Pls.' FAC"), ECF No. 40, asserts six claims for relief.  All thirteen plaintiffs claim that the CRC and JCI defendants violated (1) the regular payment schedule requirement of the DCWPCA, by failing to pay the plaintiffs promptly, on regular payment dates, and upon the plaintiffs' discharge, for "all wages earned" for certain work performed, *id*. ¶¶ 39–50 (Count I); (2) the prompt payment requirement of the FLSA, by failing to pay the plaintiffs "promptly on regular payment dates" for certain work performed, *id*. ¶¶ 56–57 (Count III); (3) the minimum wage provisions of the DCMWRA, by failing to pay the plaintiffs minimum wages "for the first 40 hours that Plaintiffs worked" for certain work performed, *id*. ¶¶ 58–63 (Count IV); and (4) the minimum wage provisions of the FLSA, by failing to pay the plaintiffs minimum wages

"promptly on regular payment dates" for certain work performed, *id*. ¶¶ 64–72 (Count V).  All thirteen plaintiffs additionally claim that the defendant Travelers breached the terms of a payment bond by which Travelers, acting as a surety, agreed to answer for the debts owed by the defendant CRC to laborers on the Project.  *Id*. ¶¶ 73–77 (Count VI).  Lastly, nine plaintiffs— Gerardo Moya, Mario Moya, Peter Soto, Wilson Perez Zapata, Jose Lenin Rocha, Juan Amurrio Quiroz, Edgardo Pablo Terceros, Samuel Lopez, and Jose Rocha Cespedes—claim that all the defendants violated the overtime provisions of the FLSA and the DCMWRA by failing to pay these plaintiffs overtime wages earned.  *Id*. ¶¶ 51–55 (Count II).  The plaintiffs seek unpaid wages and liquidated damages in the total amount of approximately $340,974.64, an unspecified amount in "unpaid overtime wages," *id.* at 13, "an additional amount of liquidated damages equal to the unpaid overtime wages," *id.* at 14, as well as attorneys' fees and costs.

The defendant CRC, in its operative cross-complaint in this action, CRC's First Amended Cross-Compl. Against JCI Defs. ("CRC's Cross-Compl."), ECF No. 79, asserts four cross-claims against the JCI defendants.  Specifically, CRC claims that it is entitled to indemnification from the defendant JCI for any amounts found to be owed to the plaintiffs (1) based on "two sub- subcontract[]" agreements between CRC and JCI, *id*. ¶¶ 11–15 (Count I), and (2) by the Department of Labor for any Davis-Beacon Act violations arising from the plaintiffs' work on the Project, "[a]s a direct result of JCI's actions and inactions," *id*. ¶¶ 16–19 (Count II).  CRC further claims that it is entitled to indemnification from the defendant Jacinto Cespedes, personally, for any amounts found by the Department of Labor to be owed to the plaintiffs for any Davis-Bacon Act violations arising from the plaintiffs' work on the Project, because Cespedes allegedly knowingly signed certified payrolls and false certifications that "JCI had paid for all labor supplied to the Project."  *Id*. ¶¶ 20–28 (Count III).  Lastly, CRC asserts a breach of

contract claim against the defendant JCI for damages in the amount of $200,879.26 as a result of

JCI's breach of the two subcontracts when JCI allegedly abandoned and failed to complete the

work for the Project.  *Id.* ¶¶ 29–36 (Count IV).

The JCI defendants assert similar cross-claims against the CRC defendants.  *See* JCI

Defs.' Countercl. Against CRC Defs. ("JCI's Cross-Compl."), ECF No. 29.[2]  The JCI defendants

claim that they are entitled to contribution from the CRC defendants "for any amounts found" to

be owed by the JCI defendants to the plaintiffs.  *Id.* at 3.[3]  The JCI defendants further assert they

are entitled to damages "resulting from breach of agreement" by the CRC defendants, and that

the CRC defendants failed to pay JCI all it was owed under the parties' "agreement for services,"

*id.* ¶ 1,  as well as "for extra work" performed by JCI outside the scope of the subcontracts, *id.* ¶

2; "for overtime work" for which the CRC defendants promised to pay; for "holiday pay cost for

the plaintiffs that [JCI] never contracted to pay," *id.* ¶ 4; and "for work [Cespedes] personally

performed," *id.* ¶¶ 3-5.

## B.    DISPOSITIVE MOTIONS

The parties engaged in extensive motions practice requiring the resolution prior to trial

of, *inter alia*, seven dispositive motions, including a motion to dismiss or, in the alternative, for

summary judgment filed by Travelers, ECF No. 43; two motions for partial summary judgment

filed by the plaintiffs, ECF Nos. 45, 96; and three motions for summary judgment filed by the

CRC defendants, ECF Nos. 49, 95, 99.

---

[2]        The JCI defendants refer to their claims as "counterclaims," when their claims are actually cross-claims, as
the parties recognized in the joint statement of the case submitted before trial.  Jt. Pre-Trial Statement ("JPTS") at 2,
ECF No. 117.
[3]        The JCI defendants' cross-complaint refers to "indemnification," but the JCI defendants are actually
seeking contribution, as the parties recognize in the joint statement of the case submitted before trial.  JPTS at 2.

Specifically, the Court denied cross-motions filed by the plaintiffs and Travelers regarding the issue of Travelers' liability for breach of contract, under Count VI of the FAC, based on a payment bond in the amount of $929,693, which Travelers signed as a surety on March 4, 2011, in connection with CRC's subcontract agreement ("Prime Subcontract") with the Project's prime contractor, Whiting-Turner Contracting Company ("Whiting-Turner").[4]   Mem. & Order (July 10, 2013) at 2, ECF No. 58.   Finding the language of the bond unambiguous, the Court concluded "that the plaintiffs are potential third-party beneficiaries of the bond" and held that, as a result, Travelers' liability, if any, depends entirely upon CRC's liability.   *Id.* at 8, 10– 12; *see id.* at 11 ("Travelers' obligation under the payment bond is co-extensive with [CRC]'s obligation to pay 'all persons supplying labor . . . in the performance of the said Contract.'" (ellipsis in original)).   CRC's liability and the plaintiffs' third-party-beneficiary status, however, could not definitively be determined due to a genuine dispute of material fact as to whether CRC was the plaintiffs' employer and "obligated to pay the plaintiffs for their work," which question "remain[ed] to be decided."   *Id.* at 11.

For the same reason, the Court subsequently denied the CRC defendants' motion for summary judgment regarding whether the plaintiffs were the CRC defendants' "employees" for purposes of the DCWPCA, the DCMWRA, and the FLSA.   Order (Nov. 15, 2013) at 1, ECF No. 74.   Material factual disputes precluded a determination of whether the plaintiffs were the CRC defendants' "employees," including, *inter alia*, factual disputes as to whether the CRC defendants (1) had the express or *de facto* power to hire and fire the plaintiffs, (2) supervised or controlled the plaintiffs' work schedules or the conditions of the plaintiffs' employment or

---

[4]        Whiting-Turner is not a party to this lawsuit.

manner of work, (3) determined the rate and method of the plaintiffs' payment, and (4) maintained employment records for the plaintiffs.  *Id*. at 2.

Similarly, the Court denied the plaintiffs' motion for partial summary judgment regarding (1) whether the CRC and JCI defendants were the plaintiffs' "joint employers," (2) "the exact wage rate to which the plaintiffs are entitled," (3) whether CRC qualifies as an "enterprise under the FLSA,"[5] and (4) whether the plaintiffs were "engaged in commerce" under the FLSA.  Mem. & Order (Mar. 30, 2015) at 5–7, ECF No. 108.  Notwithstanding that "both the CRC and JCI defendants apparently concede that the plaintiffs performed work for which they were not paid, in violation of established local and federal laws, . . . disputed facts about CRC's role in hiring the plaintiffs and/or the control, if any, CRC exercised over the plaintiffs," precluded summary judgment on the issue of "whether CRC should be considered a joint employer."  *Id*. at 5–6.  The plaintiffs' request for a judicial determination that they were entitled to a wage rate of "$33.98 per hour up to 40 hours in a work week and $39.57 for each hour over 40 that they worked in a particular week" was also disputed and precluded resolution of that issue.  In particular, the parties raised material issues about "the skill level required for the jobs assigned to the plaintiffs and the rate of pay to which they were entitled based on the jobs they actually performed," which issues were "dependent upon credibility determinations as to what was promised by Jacinto Cespedes and understood by the plaintiffs, which are quintessential determinations for the fact finder."  *Id*. at 6–7.  In light of these factual disputes, the Court concluded that it was "premature to make a finding that CRC (and/or JCI) met the definition for enterprise liability under the FLSA or other findings as a matter of law regarding the plaintiffs' coverage under the FLSA."  *Id*. at 8.

---

[5] The CRC defendants now concede that CRC qualifies as an enterprise under the FLSA.  J. Ex. 14 (stipulation as to CRC's enterprise status).

Finally, the Court denied the CRC defendants' motion for summary judgment against the JCI defendants for "breach of contract," "fraudulent misrepresentation," and "indemnification for any and all amounts found due to the Plaintiffs from CRC." *Id*. at 2, 8.  The JCI defendants raised genuine disputes of material fact regarding the negotiation, creation, performance and enforceability of the parties' subcontracts by presenting evidence of alleged "unfairness and exploitation of Jacinto Cespedes," including his "limited education, rudimentary business acumen" and lack of experience, as well as evidence that the total payment due from CRC to JCI for the subcontract work (approximately $230,499) was almost four times less than the total payment due from the prime contractor, Whiting-Turner, to CRC for the same work ($929,639). *Id*. at 9.  Moreover, the validity of the subcontracts were potentially undermined by the JCI defendants' allegations that the subcontracts "'do not contain [] federally required clauses'" and that "a Department of Labor employee allegedly 'told Jacinto Cespedes [that] JCI's contract with [CRC] was invalid because he was not advised of or required to obtain a pay bond insurance, because JCI did not have a net gross income of $500,000, and because no bidding took place for the contract.'" *Id*. (citation omitted).

The enforceability of a broad indemnification clause contained in the subcontracts depended upon the validity of the subcontracts as a whole, thereby "highlight[ing] the need to resolve the genuine issues of material fact surrounding the validity, or lack thereof, of the [subcontracts] before any judicial determinations may be made about the meaning, scope and application of the indemnification clauses." *Id*. at 10.  To the extent that the CRC defendants attempted "to assert that the indemnification clauses require JCI to indemnify CRC not only for JCI's own negligent action but also any negligent actions of CRC," however, the Court found "that allegation would fail as a matter of law." *Id*. at 10 n.2 (citing *Rivers & Bryan, Inc. v. HBE*

*Corp.*, 628 A.2d 631, 635 (D.C. 1993) ("If the [C]ourt determines that the contract is ambiguous on the issue of indemnifying the negligence of the indemnitee, then rather than the interpretation becoming a jury question, a particular result is required, . . . there is no indemnification for the indemnitee's own negligence.")).

### C.    PRETRIAL TRIAL PROCEEDINGS

Both before and after the pretrial conference, the parties argued extensively over (1) the admissibility of certain summary chart exhibits related to the total amount of the plaintiffs' damages; (2) this Court's jurisdiction to determine whether the plaintiffs' wage rate was properly classified as carpenters; and (3) the effect of a pre-trial settlement agreement between the U.S. Department of Labor ("DOL") and CRC ("DOL Settlement").  The parties' positions and the resolution, or deferral of resolution, with respect to each of these issues is summarized *seriatim* below since this background provides helpful context for the factual findings and legal conclusions reached by the Court.

### 1. Charts Summarizing the Plaintiffs' Damages

In a motion *in limine* filed before the pretrial conference, the CRC defendants and Travelers requested that the plaintiffs be barred from introducing any testimony at trial supporting the plaintiffs' claims for damages, and that the plaintiffs' proposed summary chart regarding their alleged damages derived from interrogatory answers provided by the JCI defendants, be excluded.  *See* CRC Defs. & Travelers' Motion in Limine at 2–3, ECF No. 111. This motion *in limine* was denied in its entirety at the pretrial conference, in light of Federal Rule of Evidence 1006, which provides that a summary chart may be used to prove the content of voluminous writings that cannot be conveniently examined in court, as long as the proponent makes the underlying documents reasonably available for review.  Rough Trial Tr. of Pretrial

Conference Hr'g (June 16, 2015) ("PTC Tr.") at 78–80.  To the extent the defendants argued that the underlying supporting documentation for the summary chart was "inconsistent with other underlying supporting documentation," PTC Tr. at 78, the defendants were permitted to make those arguments in evaluating the weight to be given the summary chart, but the Court held that such arguments did not warrant exclusion altogether, *id*. at 79–80.

Despite resolving the challenge to the plaintiffs' summary chart, the issue was raised again when, after the pretrial conference, the plaintiffs and the JCI defendants jointly moved to admit a "Replacement Wage and Hour Summary as a Joint Exhibit" ("Consolidated Summary Chart"), to replace both the plaintiffs' initially proposed summary chart exhibit and a separate summary chart proposed by the JCI defendants.  Mem. Op. & Order (July 1, 2015) ("Evid. Op. & Order") at 1–2 & n.2, ECF No. 137.  The CRC defendants and Travelers sought to exclude the Consolidated Summary Chart, as well as another chart, offered solely by the JCI defendants, reflecting unpaid wages information for eleven non-plaintiff workers ("Non-plaintiff Summary Chart").  *Id*.  To assist in evaluating the objections to the exhibit, the plaintiffs and JCI defendants were required "to submit . . . a description identifying for each entry on their [Consolidated Summary Chart], the derivation and source documents for the entry," and the CRC defendants and Travelers to submit, in response, an explanation of "the basis for any objection to any entry in the [Consolidated Summary Chart]," detailing "any contrary information and provid[ing] citation to any source document relied upon for the objection that the entry is erroneous."  Minute Order (June 24, 2015).

In a written Memorandum Opinion and Order, the objections of the CRC defendants and Travelers to the Consolidated Summary Chart and the Non-plaintiff Summary Chart were rejected.  *See generally* Evid. Op. & Order.  The Court explained that the Consolidated Summary

Chart Exhibit, which "reflects a compilation of evidence from disparate sources, including

'certified payrolls, daily reports, sign-in sheets' and other records . . . regarding the dates and

hours allegedly worked by the plaintiffs that were not paid at all or at the rates required by

applicable law," is "plainly relevant to the plaintiffs' claims for unpaid wages and overtime." *Id.*

at 2–3.  The CRC defendants and Travelers' objections were merely attempts to avoid "deal[ing]

with" the varied sources of evidence necessary to calculate the plaintiffs' damages and did not

identify any "actual inaccuracies in the entries" on the proffered chart. *Id.*  The objections

amounted to arguments about "which set of time records are most reliable, whether the plaintiffs

qualify as skilled carpenters or other category of labor and how much of the Federal and State

taxes have already been paid on the wages owed." *Id.* at 4–5.  Since "[s]uch arguments may be

made at trial and in post-trial briefing and do not undercut the usefulness and accuracy of the

chart in reflecting the claims of the plaintiffs," the objections were rejected. *Id*. at 5.  In the end,

the Court noted that "the challenged summary charts will certainly aid the Court in consolidating

multiple sources of information relevant to the plaintiffs' claims and the defendants' cross-claims

as well as help focus the disputed facts among the parties and clarify the substance of their

respective arguments." *Id*. at 7.

    After the pretrial conference and on the eve of trial, the CRC defendants moved to add a

trial exhibit, a document entitled "Profit and Loss Statement," ECF No. 135-1 at 9–27,

containing a "summary with respect to the actual costs incurred by [CRC]" on the Project, Trial

Tr. at 26.[6]  The underlying documents used to create the Profit and Loss Statement, including

---

[6]      The transcript of the bench trial has been placed on the docket as follows:  July 20, 2015, ECF No. 163 (pp. 1–209); July 21, 2015, ECF No. 164 (pp. 210–348); July 22, 2015, ECF No. 161 (pp. 349–495); and July 23, 2015, ECF No. 162 (pp. 496–593).  Citations to the transcript indicate, if not otherwise apparent from the context, the name of the witness testifying to the information referenced.

"invoices, delivery tickets, the certified payrolls, [and] the check entry dates," were located in eight to ten file boxes in defense counsel's office and had been available to all parties' since May 2013.  *Id*. at 27–28, 30.  According to the CRC defendants, the exhibit constitutes an admissible business record and has "absolutely no bearing" on the plaintiffs' "proof of their damages" but, rather, pertains only to the JCI defendants' unconscionability argument.  *Id*. at 26.  Upon consideration of the parties' arguments, including the plaintiffs' and the JCI defendants' objections, a ruling on the admissibility of the exhibit was reserved pending the introduction of evidence and foundational support satisfying the requirements of Federal Rule of Evidence 803(6).  *Id*. at 35; *see* FED. R. EVID. 803(6)(A)–(E) (providing five requirements that must be satisfied for records of a regularly conducted activity to be admissible notwithstanding the rule against hearsay).

At trial, a revised version of the Consolidated Summary Chart was marked as "PJ Exhibit 15" and admitted, with no renewed objection from the CRC defendants or Travelers, as a joint exhibit between the plaintiffs and the JCI defendants.  Trial Tr. at 90–91.[7]  The Non-plaintiff Summary Chart was marked as "PJ Exhibit 6" and admitted as a joint exhibit between the plaintiffs and the JCI defendants during the defendant Jacinto Cespedes' testimony, after a foundation for its admission was established and upon no further objections.  Trial Tr. at 524–27. Similarly, CRC's Profit and Loss Statement was marked at trial as "Defs.' Exhibit 13" and was admitted during the testimony of Edgar Butler, CRC's employee and accountant, over the plaintiffs' and JCI defendants' objections to the exhibit's alleged inaccuracy, which the Court ruled "goes to the weight" to be afforded to the exhibit "as opposed to its admissibility,"

---

[7]        Changes to the chart were made based on stipulations reached by the parties.  *See* Stipulations of the Parties ("First Stips.") ¶ 4(a)–(h), ECF No. 155; *id*., Ex. B, ECF No. 155-2.

particularly "given the fact that the underlying documents ha[d] been available [to the parties] for two years." *Id.* at 569–72.

### 2. Worker Classification Issue

After the pretrial hearing but before trial, the plaintiffs moved, *inter alia*, for a determination that the Court lacks jurisdiction to decide the plaintiffs' correct employment classification.  Pls.' Mot. Ruling Ct. Jurisdiction at 1, ECF No. 149.[8]  The plaintiffs argued that the DOL alone has jurisdiction to determine worker classifications and that the Court may only decide the factual issue of what classification the plaintiffs actually received.  *Id.* at 2–3, 7, 9.  In response, the CRC defendants and Travelers argued that the plaintiffs were judicially estopped from claiming that the DOL controls the classification of laborers, since the plaintiffs' position has been that any DOL administrative determination regarding the Project "is not significantly related to this case."  CRC Defs. & Travelers' Mem. Opp'n Pls.' Mot. Ruling Ct.'s Jurisdiction at 1–2, ECF No. 151.  The JCI defendants took no position, asserting that "it's always been Mr. Cespedes' position that [the plaintiffs] were carpenters."  Trial Tr. at 36.  The Court reserved ruling on this belatedly raised issue until completion of post-trial briefing.  *Id.* at 54.

### 3. Department of Labor Settlement Agreement

DOL's Wage and Hour Division ("WHD") conducted an investigation of CRC and JCI for violations of the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq*., and related regulations, 29 C.F.R. §§ 5.1–5.32.[9]  Shortly before trial, the CRC defendants and Travelers notified the Court

---

[8]     The plaintiffs also moved to add as a witness an experienced local carpenter and union organizer, Raul Castro Ramirez, to testify that the work performed by the plaintiffs all falls within the definition of carpentry work. *Id.* at 2, 10.  This motion was granted, Trial Tr. at 60, but the plaintiffs did not call Mr. Ramirez as a witness at trial.

[9]     The Court had previously denied a request by the CRC defendants and Travelers to stay the instant case due to DOL's investigation and ongoing administrative proceedings, "[s]ince the plaintiffs' claims are predicated on violations of the DCWPCA, the DCMWRA, and the FLSA," and Davis-Bacon Act proceedings "are not necessarily germane to the instant action and, therefore, proceedings in this case need not be bound in any way to those administrative proceedings."  Order (Nov. 15, 2013) at 2-3, ECF No. 74.

that CRC had finalized a settlement agreement with the DOL in June 2015, Second Joint Status

Rep. at 1, ECF No. 134, and "resolve[d] all disputes arising from an FLSA, Davis-Bacon and

CWHSSA investigation conducted by the WHD of [CRC] and [JCI] . . . on a construction

contract . . . awarded by the District of Columbia Courts to Whiting-Turner," *id.*, Ex. A, DOL

Settlement Agreement ¶ 2, ECF No. 134-1; Defs.' Ex. 18 (DOL Settlement Agreement) ¶ 2.

Pursuant to the DOL Settlement Agreement, CRC consented to pay "back wages in the

amount of $150,000," and agreed to waive its right to a hearing on the WHD's investigative

findings.  Defs.' Ex. 18 ¶ 4.  The $150,000 was to be distributed in specified amounts by WHD

to twenty-two persons listed in an attachment to the agreement, *id.* ¶ 9, which list included the

thirteen plaintiffs in this action.  Although CRC and the WHD "agree[d] that all matters

pertaining to the payment of wages for work performed by [CRC] on its subcontract with

Whiting-Turner" were "fully and finally resolved by this agreement," *id.* ¶ 4, "[t]he WHD

acknowledge[d] that" the plaintiffs in the instant case, "thirteen (13) of the twenty-two (22)

employees listed on Exhibit A[,]" had filed suit in this Court "concerning the same

circumstances investigated by WHD," *id.* ¶ 9; *id.*, Ex. A.  Accordingly, the DOL Settlement

Agreement provided that CRC "may request from the WHD notification of payment to any

employee pursuing the [instant] [a]ction, and [CRC] may introduce such notification as evidence

in the [instant] [a]ction, to the extent allowable by law, to prevent double recovery by any

employee."  *Id.*  Notably, the Settlement Agreement expressly stated that CRC did "not concede

it employed five (5) of the employees included on Exhibit A," but none of those five employees

is a plaintiff in the instant case. *Id.* ¶ 10.

In light of the DOL Settlement Agreement, the Court directed the parties to submit before

trial "an explanation of the impact, if any" of this agreement "on any factual and legal issues

requiring resolution at the scheduled bench trial [in] this matter, including (1) whether CRC will seek to introduce notification of payment to the plaintiffs . . . ; (2) whether the Settlement Agreement should be construed as CRC's concession of employment of the plaintiffs, particularly in light of CRC's express renouncement of employment of only five other individuals . . . ; (3) whether CRC's cross-claims for indemnification for any amounts due to plaintiffs through the Department of Labor continue to have any viability since the prime contractor agreed to issue a check for the payment of back wages to the plaintiffs . . . ; and (4) how [the JCI defendants'] cross-claim for 'indemnification' from defendant CRC is affected, if at all, by the Settlement Agreement."  Minute Order (June 29, 2015).

The parties submitted responsive briefing, but also "pose[d] a number of additional issues for the Court to consider."  Trial Tr. at 5.  CRC informed the Court that it would "seek to introduce the Settlement Agreement with DOL" and would continue "to seek indemnification from Jacinto Construction, Inc. and Jacinto Cespedes."  CRC Defs.' Resp. Ct.'s Min. Order June 29, 2015 ("CRC Defs.' Resp.") at 2-3, ECF No. 138.  CRC also argued that the settlement agreement should not be construed as an admission of CRC's status as an "employer" of the plaintiffs.  *Id.* at 3-4.

The JCI defendants' response acknowledged that "[a]ny amount paid to the plaintiffs by either Calderon or Whiting Turner for payment of back wages to the plaintiffs" would affect both CRC and JCI's cross-claims "by reducing the amount of that claim."  JCI Defs.' Resp. Ct.'s Min. Order June 29, 2015 ("JCI Defs.' Resp.") at 5-6, ECF No. 140.  All parties agreed that payments made under the DOL Settlement Agreement would offset any damages to which the plaintiffs were entitled.  Trial Tr. at 11 (Court noting that "everybody agrees, at a minimum, that the

Department of Labor Settlement is an offset, at a minimum, against whatever unpaid wages the plaintiffs are seeking here.").

In addition to the responses provided by the parties to the Court's questions, the CRC defendants and Travelers requested that DOL's finding "on the amount of back wages be given deference and adopted by the Court as full and final satisfaction of the claims asserted" by the plaintiffs in the instant case. CRC Defs.' Resp. at 3; Travelers' Resp. June 29, 2015 Min. Order ("Travelers' Resp.") at 1–3, ECF No. 139. Travelers additionally requested a ruling that statutory liquidated damages and attorneys' fees are not recoverable against the payment bond, Travelers' Resp. at 4–6, and, in response, the plaintiffs requested a contrary ruling, that Travelers is liable for liquidated damages and attorneys' fees under the bond, Pls.' Consolidated Resp. June 29, 2015 Min. Order Impact Settlement Agreement & Resps. Travelers & CRC Defs. Same Order ("Pls.' Resp.") at 2, ECF No. 145. Lastly, the plaintiffs and the JCI defendants requested a ruling that CRC made a binding admission in the DOL Settlement Agreement that it employed the plaintiffs and can, therefore, no longer contest the issue. JCI Defs.' Resp. at 6; Pls.' Resp. at 2.

The Court found that the DOL Settlement Agreement "does not constitute the full and final satisfaction of the claims asserted by the plaintiffs in this case," since "[i]t is undisputed that" the plaintiffs "were not part of settlement negotiations with the [DOL], nor did they expressly or impliedly waive their right to proceed with this lawsuit, nor has the [DOL] asked them to waive their rights[,] [a]nd they will not receive from the [S]ettlement all of the wages they claim they are owed," Trial Tr. at 74. By expressly acknowledging the instant case, the DOL Settlement Agreement "impliedly recognizes that the plaintiffs may still pursue this action for the balance of wages they are owed and that the money they receive through the settlement

15

agreement will merely offset their recovery." *Id*. at 74-75.  Since the plaintiffs "did not sign any

release surrendering any of their rights, nor were they ever asked to do so by the [DOL]," the

Court found that the plaintiffs "did not release their claims against the defendants." *Id*. at 75

(citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 306–07 (7th Cir. 1986)).

Accordingly, the Court concluded "that the [DOL] settlement doesn't preclude the plaintiffs'

claims here, but, instead, will serve only as an offset to any damages that may be found here."

Trial Tr. at 77.

With respect to Travelers' and the plaintiffs' divergent requests for rulings about whether

Travelers was liable under the surety bond for attorneys' fees and liquidated damages, the Court

reserved ruling.  Trial Tr. at 77.  While the surety bond contains "very broad language" and

"does not appear to exclude such payments or be so limited as Travelers seeks to narrowly

construe it," the Court found no "reason for a final ruling on this issue yet," since a

determination need only be made "in the event that CRC is found liable." *Id*. at 78.

Consequently, the Court reserved ruling on whether Travelers would be liable under the bond for

attorneys' fees and liquidated damages. *Id*.

Lastly, the Court similarly reserved ruling on whether CRC admitted in the DOL

Settlement Agreement that it employed the plaintiffs, until hearing all of the evidence in the case.

*Id*. at 79.

### D.    BENCH TRIAL

A bench trial was conducted over the course of four days, with live testimony from a total

of fifteen witnesses, including twelve of the plaintiffs (Luis Rocha, Peter Soto, Wilson Perez

Zapata, Edgardo Pablo Terceros, Freddy Paz Perez, Juan Amurio Quiroz, Jose Lenin Rocha

Quiroz, Mario Moya, Geraldo Moya, Jose Rocha Cespedes, Samuel Lopez,  and Javier Cespedes

Becerra), defendant Jacinto Cespedes, Enrique Sanz, who worked as CRC's foreman on the Project, and Edgar Butler, who, as noted, was CRC's accountant.  A stipulation was read into the record as to what the plaintiff Jose Ramiro Perez would say if called to testify.  Trial Tr. at 575. None of the defendants called any witnesses for the defense case.  *See* Trial Tr. at 576–77.

The Court received the following exhibits into evidence during the bench trial:  thirty-six exhibits submitted jointly by all of the parties, Joint. Exs. ("J. Ex.") 1–36, *see* Ex. Log, ECF No. 158; six exhibits submitted jointly by the plaintiffs and the JCI defendants, Pls.' Joint  Exs. ("PJ Ex.") 6, 7, 9, 12, 13, 15, *see* Ex. Log., ECF No. 159; eight plaintiffs' exhibits, Pls.' Exs. 1–8, *see* Ex. Log, ECF No. 156, including the deposition of Jacinto Cespedes (May 22, 2013) ("Cespedes Dep.") as Pls.' Ex. 5; the deposition of Ana Calderon (April 29, 2014) ("Ana Calderon Dep.") as Pls.' Ex. 6; and the deposition of Carlos Calderon (October 22, 2013) ("Carlos Calderon Dep.") as Pls.' Ex. 7; and thirteen exhibits submitted by the CRC defendants, Defs.' Exs. 1, 4, 10–11, 13, 15, 17–19, 21, 25, 27–28, *see* Ex. Log., ECF No. 157.  In addition, the parties entered a number of stipulations, memorialized in two documents filed on the record.  *See* Stipulations of the Parties ("First Stips."), ECF No. 155; Stipulations of the Parties ("Second Stips."), ECF No. 160.

Following the conclusion of the bench trial, the parties submitted tables of proposed findings of fact ("FOF") regarding: (1) the plaintiffs' claims, *see* Pls.' Proposed FOF Re: CRC & Travelers ("FOF Table – Pls. v. CRC & Travelers"), ECF No. 174; Pls.' Proposed FOF re: JCI ("FOF Table – Pls. v. JCI"), ECF No. 173; (2) the CRC defendants' cross-claims against the JCI defendants, *see* CRC's Proposed FOF Re: Cross-Claim ("FOF Table – CRC v. JCI"), ECF No. 175; and (3) the JCI defendants' cross-claims against the CRC defendants, *see* JCI's Proposed

FOF Re: Cross-Claim ("FOF Table – JCI v. CRC"), ECF No. 176.[10]  The parties also submitted

proposed conclusions of law ("COL") regarding (1) the plaintiffs' claims, *see* Pls.' Proposed

COL ("Pls.' COL"), ECF No. 177; Def. Travelers' Proposed COL ("Travelers' COL"), ECF No.

179; CRC Defs.' Resp. Pls.' Proposed COL ("CRC Defs.' Resp. Pls.' COL"), ECF No. 182; JCI

Defs.' Proposed Resps. Pls.' COL ("JCI Defs.' Resp. Pls.' COL"), ECF No. 180; Pls.' Reply

CRC Defs. & Travelers' COL ("Pls.' Reply CRC Defs.' & Travelers COL"), ECF No. 185; Pls.'

Reply JCI Defs.' COL ("Pls.' Reply JCI Defs.' COL"), ECF No. 183; (2) the defendant CRC's

cross-claims against the JCI defendants, *see* CRC Defs.' Proposed COL Regarding Cross-Cl.

Against JCI Defs. ("CRC's COL"), ECF No. 178; JCI Defs.' Opp'n CRC's Proposed COL

Regarding Cross-Cl. ("JCI Defs.' Opp'n CRC's COL"), ECF No. 184; and (3) the JCI

defendants' cross-claims against the CRC defendants, *see* JCI Defs.' Proposed COL Regarding

Cross-Cl. Against CRC Defs. ("JCI Defs.' COL"), ECF No. 181; CRC Defs.' Opp'n JCI Defs.'

Proposed COL ("CRC Defs.' Opp'n JCI Defs.' COL"), ECF No. 186; JCI Defs.' Reply CRC's

Opp'n Proposed COL Regarding Cross-Cl. ("JCI Defs.' Reply COL"), ECF No. 188.[11]  The

Court has considered these submissions along with the testimony and exhibits at trial.

## II.    FINDINGS OF FACT

Based upon the parties' stipulations, testimony presented, and exhibits admitted at the

bench trial, the Court makes the findings of fact set forth below and further states its conclusions

of law.  *See* FED. R. CIV. P. 52(a)(1) ("In an action tried on the facts without a jury . . . , the court

---

[10]    The Court's Final Pretrial Order at ¶ 8, ECF No. 123, directed that the FOF tables be filed first as proposed findings by the plaintiffs or cross-claimants, then with responses from opposing parties, and finally with replies from the original parties. Consequently, only the final iteration of each table noting remaining factual disputes needs to be considered by the Court.

[11]    The JCI defendants have moved "for the entry of an order striking from the record" the CRC defendants' opposition to the JCI defendants' proposed conclusions of law because that opposition was filed late without leave of the Court.  JCI Defs.' Mot. Entry Order Striking CRC's Opp'n JCI Defs.' Proposed COL, ECF No. 187.  Since the Court holds that the subcontracts between the JCI defendants and the CRC defendants are unenforceable, this motion to strike is denied as moot.

must find the facts specially and state its conclusions of law separately.  The findings and conclusions … may appear in an opinion or a memorandum of decision filed by the court.").  In setting forth the findings of fact, the court need not "address every factual contention and argumentative detail raised by the parties," *Mayaguez v. Corporacion Para El Desarrollo Del Oeste*, 824 F. Supp. 2d 289, 295 (D.P.R. 2011), or "discuss all evidence presented at trial," *Wachovia Bank N.A., Nat. Ass'n v. Tien*, 598 F. App'x 613, 617–618 (11th Cir. 2014).  Instead, the Advisory Committee Notes on Rule 52 explain that "a judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  FED. R. CIV. P. 52(a), Advisory Committee's Note to 1946 Amendment.  While "a district court's opinion should not simply state conclusions where circumstances require more detail," courts have "wide leeway… in determining what facts to include."  *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1160-1161 (1st Cir. 1992) (Breyer, C.J.).  The findings must be "sufficient to allow [the appellate] court to conduct a meaningful review, which is the main point of the rule."  *Caffey v. West*, 1998 U.S. App. LEXIS 4689, 6-7 (D.C. Cir. Feb. 9, 1998); *see also* Lyles v. United States, 759 F.2d 941, 943-945 (D.C. Cir. 1985)(noting that "an appellate court requires some reasonable measure of detail and exactness in the trial court's findings as a predicate for intelligent review") (internal quotations omitted); *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F. 2d 1052, 1058 (2d Cir. 1992) ("All that is required by Rule 52(a) is that the trial court provide findings that are adequate to allow a clear understanding of its ruling").

## A.     The Prime Subcontract

On January 7, 2011, Whiting-Turner entered into a subcontract ("the Prime Subcontract") with CRC to complete portions of a project renovating the D.C. Superior Court for the fixed

price of $929,639.00.  J. Ex. 2 (Subcontract between Whiting Turner and CRC).  Carlos

Calderon is president of CRC, which has been in business for over 20 years, but only recently

began working on federal contracts.  Pls.' Ex. 7 (Carlos Calderon Dep.) at 8-9.  The Prime

Subcontract required CRC to do "drywall, framing, ceilings, doors[,] hardware" and "rough

carpentry" for the Superior Court renovation.  *Id.* at 14-15.  Carlos Calderon estimated that 40

percent of his contract with Whiting-Turner concerned putting up drywall and "framing," thirty

percent involved work on the ceilings, and the remaining thirty percent concerned "acoustics"

and "GRG molding."  *Id.* at 16.  He understood that, under the Prime Subcontract, he was

required to pay workers "consistent[] with the Department of Labor's prevailing wages" at the

time of the work, *id.* at 24, and that the contract expressly provided that any person classified as

a "carpenter" was entitled to a wage of $33.38 per hour, *id.* at 30.

The Prime Subcontract between Whiting-Turner and CRC required CRC to "provide on-

site supervision and coordination" of "Second Tier Subcontractors," J. Ex. 2 at SC13.  To this

end, in February 2011, Enrique Sanz began work on the Project as CRC's foreman, with only

one other CRC employee, who helped "doing the layout" until the general contractor, Whiting-

Turner, granted approval to "start with the framing" work.  Trial Tr. at 97, 119, 171.

### B.      Carlos Calderon Hires Jacinto Cespedes

In early April 2011, Carlos Calderon was put in contact with Jacinto Cespedes by

Cespedes's brother for purposes of hiring a subcontractor for the Project.  *Id.* at 313–14, 383.

Cespedes had worked in the construction industry for approximately 30 years and owned JCI

with his wife for the duration of its existence, from 2010 to 2013.  *Id.* at 312–13, 394, 438.  On

around April 10, 2011, as instructed by Carlos Calderon, Cespedes went to the Project site and

met with Enrique Sanz for approximately 30 minutes, reviewing the layout of the Project.  *Id.* at

314–15.  Enrique Sanz showed Cespedes "three floors," but did not show him the "basement" or "roof."  *Id.* at 315, 383-84.  Immediately after the tour, Cespedes went to CRC's office and met with Carlos Calderon, who told Cespedes to start work on the Project right away and that four carpenters were needed.  *Id.* at 314, 319.  They did not sign a subcontract or speak about contract prices at this meeting but, nonetheless, the next day, on around April 11, 2011, Cespedes and three other workers, Juan Quiroz, Jose Rocha, and Luis Rocha, began work on the Project as carpenters.  *Id.* at 314, 318, 320.

Approximately one week later, during Cespedes' second week working on the Project, he met again at Calderon's office with Carlos Calderon, who presented him with a written subcontract agreement ("First Subcontract").  *Id.* at 322. The First Subcontract was drafted by CRC and set a fixed price of $191,099.10 that JCI would receive for its work on the Project.  *Id.* at 318; J. Ex. 3 (First Subcontract) at 4.  The contract price was set regardless of the number of workers utilized or the overall cost of labor.  *See* FOF Table – Pls. v. CRC & Travelers ¶ 8.  Like the Prime Subcontract, the language of the First Subcontract provided that any person classified as a "carpenter" was entitled to a wage of $33.38 per hour.  J. Ex. 3 (First Subcontract) at APPENDIX 4.  Virtually all of CRC's construction work on the Project was, according to Carlos Calderon, performed by JCI under this Subcontract.  Pls.' Ex. 7 (Carlos Calderon Dep.) at 59.

Carlos Calderon and Cespedes did not negotiate the contract or review its contents.  Trial Tr. at 324, 435-36.  Rather, Carlos Calderon advised Cespedes that the first three pages were "just regulations" and did not need to be read.  *Id.* at 326-29.  Cespedes testified that he cannot read or write in the English language, *id.* at 312, 381, and that due to his illiteracy, he was unable to read the First Subcontract, to review the scope of the work described by its terms, or to compare that scope of work to the scope of the work required under the Prime Subcontract,

which he never received or read, *id.* at 404–05.  Cespedes signed the subcontract without reading it, and his testimony at trial did not help explain, what, if anything, he understood to be the terms of the agreement between JCI and CRC.  *Id.* at 322-36.

### C. Plaintiffs' Work on the Project

Both CRC's foreman, Enrique Sanz, and Jacinto Cespedes were present on site at the Project every day, except for one week in September or October 2011 when Cespedes was off-site.  *Id*. at 100-101; 329–31.  Sanz was responsible for ensuring that all the workers were equipped with the proper equipment, including ladders and scaffolding, which equipment was owned by CRC and needed for the workers on the Project.  *Id*. at 100–01, 130–31, 171–72. While Carlos Calderon did not work directly on the site, he testified at his deposition that Sanz, would advise him of "any issues with [Whiting-Turner], and problems with the trades, and coordinations, [and] the scheduling" of the job.  Pls.' Ex. 7 (Carlos Calderon Dep.) at 40.  Carlos Calderon confirmed that CRC provided "scaffolds, lifts, and ladders" on the Project.  *Id.* at 50.

Sanz was also responsible for conducting "safety meetings" with the workers, communicating with the CRC office regarding materials needed for the work, coordinating with the general contractor regarding where work would start or continue, and directing the workers "where to go, what to do, what is the material."  *Id.* at 100–01, 131; *see also id.* at 107 (Sanz agreeing that he gave "workers assignments each day on what they were supposed to do").  Sanz would typically spend "the whole day" supervising the workers on the Project, walking around each level of the building to "be sure that everybody is doing it the right way," particularly since workers must "follow the specific rules or directions on government jobs" to comply with certain federal construction specifications.  *Id*. at 105–06.  Workers generally treated Sanz as their supervisor and would ask or tell Sanz if they needed to take breaks or leave early.  *Id*. at 109.

Jacinto Cespedes also supervised the plaintiffs and acknowledged that, at a minimum, they were employees of JCI.  Second Stips. ¶ 1.  During the time JCI was engaged on the Project, Cespedes also had employees working on one or two other projects unrelated to its subcontracts with CRC. *Id.* at 488-92.

Based on Whiting-Turner's needs or requests, Enrique Sanz would determine how many workers were needed for the Project each day and arrange for the right number of individuals to come to the site, coordinating "most of the time" with Jacinto Cespedes.  *Id*. at 112.  When the workers were "slow" and Whiting-Turner "wasn't happy," Sanz spoke with Carlos Calderon to keep him informed and solicit his instructions for dealing with the issue.  *Id*. at 137–39.  "[A]t least six [or] . . . seven times," when more workers were needed, Sanz also spoke to Carlos Calderon about it.  *Id*. at 109, 112; *see also id*. at 101 ("[I]n this case, my office send to me [the workers] in order to just make . . . the work to be done.").

The plaintiffs testified that they were supervised and instructed on the Project by both Jacinto Cespedes and Enrique Sanz and considered both of them to be their bosses.  *Id.* at 178–79 (Luis Rocha Moya); 190 (Peter Soto); 217, 223 (Wilson Perez Zapata); 240–41 (Edgardo Pablo Terceros); 251–52 (Freddy Paz Perez); 261 (Juan Amurio Quiroz); 263 (Jose Lenin Rocha Quiroz); 273 (Mario Moya); 284–86 (Gerardo Moya); 293, 300 (Jose Rocha Cespedes); 302 (Samuel Lopez).  Both Sanz and Cespedes confirmed that they managed the plaintiffs on site, directing work on the site or coordinating who came to work and for what periods of time.  *Id.* at 105-106 (Sanz); 336 (Cespedes).

In addition to their supervisory roles, both Cespedes and Sanz were in charge of keeping various records related to work on the Project.  Cespedes was required to provide regular certified payrolls to CRC and used Oropeza and Associates, an accounting firm that had

represented his previous business venture, to handle this paperwork and accounting for his new

company. *Id.* at 449.[12]   Certified payroll records were prepared by Oropeza, in coordination with

"Calderon's accountant," and Cespedes signed them. *Id.* at 344.   Cespedes then delivered the

payrolls to Edgar Butler, CRC's accountant. *Id*. at 371.   Cespedes also prepared daily contractor

reports for the Project. J. Ex. 11 (Contractor's Daily Reports) at 494-576.   Both the certified

payroll records and the Contractor's Daily Reports classified the plaintiffs as "Carpenters,"

except for (1) Certified Payrolls 25 and 26, which classified some plaintiffs at the "Skilled

Labor" wage instead of the "Carpenter" wage, J. Ex. 10 (certified payroll records) at 118- 126;

and (2) Contractor's Daily Reports for July 13, 2011 to July 29, 2011, which listed Mario and

Gerardo Moya as "finishers" while the certified payrolls for that time classified them as

"carpenters." *Compare* J. Ex. 10 at 89-92 (certified payrolls listing both Moyas as "Carpenters"),

*with* J. Ex. 11 at 559-570 (daily reports listing both Moyas as "Finishers").   Finally, Cespedes

kept various handwritten records listing the names of the workers and the number of hours they

worked on the Project by date. *Id*. at 366–67; J. Ex. 12 (copy of Jacinto Cespedes' handwritten

records).

Like Cespedes, Sanz kept written documentation of the time the plaintiffs worked on the

Project and their tasks, *id*. at 95–96, including a "contractor's daily report" documenting "the

people that I have working with me" and "any change on the progress of the job . . . in order to . .

. let my office [CRC] know what we doing," *id*. at 101.   Carlos Calderon instructed Sanz to

record the number of hours that each worker worked on the daily reports, but did "[n]ot really"

tell him to record the workers' classifications because "[Carlos Calderon] just said I want to just

---

[12]     Prior to trial, the Court granted a motion to dismiss a third-party complaint filed by the defendant CRC against Oropeza, finding that the third-party complaint "fail[ed] to allege facts that would plausibly entitle [CRC] to indemnification from Oropeza."  Mem. & Order (Mar. 1, 2013) at 3, ECF No. 38.

send you carpenters, you know, to the job." *Id*. at 101–02.  Sanz provided the contractor's daily

reports, as well as a separate daily "timesheet" that he was required to complete, to CRC.  *Id*. at

102–03.  Sometimes, however, Sanz would be too busy to complete the daily report, so he would

photocopy a sign-in sheet kept in a binder by Whiting-Turner, documenting each worker's daily

sign-in, and send that to the CRC office instead of a daily report.  *Id*. at 103, 121.

In addition to the daily reports and timesheets, CRC required Sanz to complete work

progress reports for CRC, approximately every two weeks, "about how many sheets of drywall

or how many linear feet of the framing was done." *Id*. at 115–16, 175.  With respect to these

reports, Ana Calderon, who was CRC's bookkeeper, instructed Sanz to "take some amount out"

and not report the "whole thing." *Id*. at 116.  For example, if 100 sheets of drywall were hung,

Sanz was required "to report it as 80." *Id*.  Sanz informed Jacinto Cespedes of this arrangement,

telling Jacinto Cespedes "that was the way they were doing it." *Id*.  This under-reporting enabled

CRC to make lower progress payments to JCI.  *Id*. at 175.  Though Jacinto Cespedes complained

to Sanz about the reduced amount of work reported, Ana Calderon, nonetheless, firmly instructed

Sanz to "just keep for the company, like, 20 percent . . . ." *Id*. at 117.  Sanz was under the

impression that underreporting the progress of the work was "the rule of the company [CRC]."

*Id*. at 174–75.

### D.    The Second Subcontract

In June 2011, Cespedes again met with Calderon and signed a second subcontract ("the

Second Subcontract").  Trial Tr. at 398-401.  Pursuant to the Second Subcontract, JCI agreed to

perform finishing work on the Project that Cespedes believed was not included in the First

Subcontract.  Cespedes testified that, since the workers "had already started work finishing," he

felt he "would have to sign." *Id*. at 400–01.  The Second Subcontract, which was written in

English, required JCI to perform work for a fixed price of $39,400.  J. Ex. 4 (Second

Subcontract) at 1, 4-5.  Again, Cespedes testified that he did not read or understand the Second

Subcontract before signing it.  *Id.* at 434-35.

### E. Nonpayment of Wages Owed to Plaintiffs

Around this time, in June 2011, Jacinto Cespedes stopped paying the plaintiffs

consistently, Second Stips. at ¶ 4, a circumstance about which he informed Ana and Carlos

Calderon.  Trial Tr. at 347, 353.  Cespedes testified that he would visit the CRC office to discuss

these payment issues and Ana Calderon "would say, 'Why don't you pay them [the workers] a

decreased rate?'"  *Id.*  On at least one occasion, in response to Cespedes's complaints about not

being paid sufficient funds to pay the workers their wages owed, Carlos Calderon echoed Ana

Calderon and also suggested that Cespedes change the classification of the workers, though

Cespedes inconsistently claimed not to understand worker classification.  *Id*. at 344–45; *see id.* at

346 ("When he couldn't pay, Calderon suggested that I reduce them to skilled labor.").

Carlos Calderon also told Cespedes to hire workers who were in the country illegally,

because he could pay them lower wages.  *Id.* at 360-62.  Cespedes hired four undocumented

workers, who are not parties to this suit, and paid them less than the wages to which Cespedes

himself believed they were legally entitled.  *Id.* at 360, 362.  Cespedes, with Sanz's assistance

would sneak them into the site each day by using other employees' work badges to gain access to

the Project site.  *Id.* at 360-364.  Sanz would "use his badge, and he would get a visitor badge

from the office" for the undocumented workers, "and [the workers] would go in with the badges

and nobody would say anything," *id.* at 414, effectively passing off the workers as individuals

permitted to be on site.

In addition to hiring undocumented workers, Cespedes complied with the Calderons' suggestion to change the wage rate classification for some of his workers from the amount that corresponded to "Carpenters" to a lower amount that corresponded to the classification for "Skilled Laborers" on the certified payrolls.  *Id.* at 346.  On September 30, 2011 and October 10, 2011, Cespedes signed Certified Payrolls 25 and 26, showing the "Skilled Labor" wage rate instead of the "Carpenter" wage rate for some of the plaintiffs.  J. Ex. 11 (Contractor's Daily Reports) at CALD 118-122.  On November 8, 2011, Edgar Butler sent a fax to Oropeza and Associates, asking JCI's accountant to reclassify certain employees "per Jacinto Cespedes['s] request."  J. Ex. 15.  Butler sent this fax after conferring with Carlos Calderon.  FOF: Pls. v. CRC ¶ 87 (not disputed).  Butler claims, however, not to remember what specifically was discussed with Carlos Calderon or the latter's recommendations.  *Id.* at 553.  The resulting change in classification created certified payrolls with workers being paid at a lower rate than as carpenters.  J. Ex.10 (Contractor's Daily Reports) at CALD 122.  As a result of this reduction in the payroll rate, Butler stopped submitting the certified payrolls to Whiting-Turner, *id,* at 551-52, and testified that to have knowingly done so would have constituted fraud in his mind, presumably due to the fact that the workers should have been paid at the carpenters' rate.  *Id.* at 555.

## F.     Plaintiffs and Jacinto Cespedes Quit

During the final three weeks that the plaintiffs worked on the Project, from October 29 to November 15, 2011, none of the plaintiffs were paid any wages.  First Stips. ¶ 4(b).  On multiple occasions, workers complained directly to Carlos Calderon about not being paid, but nothing came of their complaints.  Trial Tr. at 122, 127-128, 150-151.  After Cespedes complained to Whiting-Turner a number of times about not being paid by CRC, Whiting-Turner called a

meeting among Cespedes, Carlos Calderon and "Jeff . . . the superintendent at Whiting-Turner." *Id*. at 372.  At this meeting, Carlos Calderon told everyone that he "was going to pay," which Jacinto Cespedes understood to mean that CRC would pay JCI so that Cespedes could pay the workers, *id.* at 374, but no payments were forthcoming, *id.* at 376.

Carlos Calderon subsequently had two meetings with the workers on the Project.  *Id*. at 117–22, 219, 231.  At the first of these meetings, in response to the plaintiffs' complaint that they were not getting paid, Carlos Calderon urged the workers to keep working and assured them that he would "straighten everything out with Jacinto" as long as they kept working.  *Id*. at 127. Carlos Calderon "agreed that he would pay . . . but without making any discounts or withdrawals from the paychecks," at a rate of $26.38 per hour.  *Id*. at 126-128, 193, 195, 201, 218-219, 374–75.

Carlos Calderon spoke to the workers a second time at the Project site, when Jacinto Cespedes was not present.  *Id*. at 127.  Carlos Calderon told the workers that he would "take care about the money that Jacinto owed them," "try to straighten everything up" and "try to find out why" Jacinto Cespedes had not paid the workers.  *Id*. at 127–28.  At this second meeting, Carlos Calderon also mentioned paying the workers directly.  *Id*. at 128.

According to Jacinto Cespedes, after the second conversation between Calderon and the plaintiffs, Cespedes told the workers that "Calderon had said that he didn't want to see me on the site anymore and I cannot continue to work like this," and all the workers decided to leave the site with Cespedes that day.  *Id*. at 377–78; *see also id.* at 226 (testimony of Wilson Perez Zapata that Cespedes left the same day); *id*. at 262 (testimony of Juan Amurio Quiroz that he worked until November 15, 2011 and was "the last one to be working there").  Cespedes testified that, by

this time, he had stopped reporting hours to his accountant, but that he continued to keep track of hours worked in a handwritten document.  *Id.* at 468, 474-75.

Sanz remained on the Project as the foreman after JCI and the plaintiffs stopped working. *Id.* at 132.  Carlos Calderon sent other workers employed by CRC to complete the work on the Project under Sanz's supervision.  *Id.*  When CRC sent its own employees to finish the job, the listed employees were classified as carpenters, not as skilled laborers.  *Id.* at 133-34, 555. According to CRC "the cost to complete the work left to be finished was $200,879.96."  CRC's COL at 10.

### G.    Unpaid Wages

Discerning the precise amount of unpaid wages owed to the plaintiffs is challenging since the exhibits submitted by the parties reflect inconsistent reported times worked by each plaintiff, different amounts of overtime worked by each plaintiff, and different amounts of total compensation owed to each plaintiff.[13]  The plaintiffs and JCI's jointly-submitted Consolidated Summary Chart assists in synthesizing the disparate sources of documentation on this issue.  The Consolidated Summary Chart outlines for each plaintiff the weeks he worked, the hours he worked per week, the "straight" time and overtime he worked per week, the gross pay he received for each corresponding week, the total asserted proper pay per week, and the alleged amount remaining unpaid to each plaintiff, all with reference to checks that were entered into evidence, or reference to hours recorded by JCI or CRC.  The plaintiffs, JCI and Jacinto Cespedes agree that the Consolidated Summary Chart is an accurate and complete summary of

---

[13]     Documentation underlying the claimed unpaid wages include: contractor's daily work reports, J. Ex. 11; Jacinto Cespedes's handwritten logs of employee work, J. Ex. 12; CRC's certified payroll records, J. Ex. 10; Jacinto Cespedes's handwritten logs of unpaid employees, Def.'s  Ex. 11; Jacinto Cespedes's handwritten records on the part of JCI as to overtime, Def. Ex. 12; and a summary of all checks issued by and returned to Jacinto Cespedes, Pl. Ex. 1.

the hours worked and the corresponding partial payments received by each plaintiff.  Pls.' and JCI's Joint Mot. Admit Summ. Ex., ECF No. 124, at 1-2.

While the CRC and Travelers defendants challenged the Consolidated Summary Chart as incorrect or prejudicial,  CRC Defs. & Travelers' Joint Resp. Pls.' Mot. Substitute Ex., ECF No. 130, at 1-2, the Court made clear that "the onus is on them to persuade the Court of their position," Evid. Op. & Order, at 2, 4.  To contest the Consolidated Summary Chart, the defendants admitted, on the last day of trial, Defendants' Exhibit No. 28.  Trial Tr. at 503.  In contrast to the comprehensive Consolidated Summary Chart, the Defendants' Exhibit 28 is a single-page document titled "Straight Time," listing each of the thirteen plaintiffs, and three columns providing reported hours for each plaintiff. The first column is titled "certified payrolls"; the second column is titled "Plaintiffs"; and the third column is titled "JCI Initial Answers."  Presumably, these total hours in each column per plaintiff reflects differing amounts reported for the plaintiffs' hours from the three sources cited.  The "Plaintiffs" column shows a "Total" number of hours worked for all the plaintiffs of 7886 hours, which corresponds to the hours on the Consolidated Summary Chart; the column "JCI Initial Answer" shows the highest total hours worked by plaintiffs of 8,207; and the "Certified Payrolls" column, presumably referring to the Certified Payrolls submitted to Whiting-Turner that all parties agree are incorrect in some respect, shows the lowest total hours worked of 7,826, which differs from the Consolidated Summary Chart by only 60 hours.

All parties agree that the plaintiffs worked weeks and hours for which they were not paid, First Stips. ¶ 4(c), and even agree on the weeks in which plaintiffs were not paid.  *Id.*  Given these concessions, the defendants' identification of some inconsistencies in the record regarding the plaintiffs' unpaid hours does not preclude the plaintiffs from recovering.  *See* FOF – CRC v.

Pls. ¶ 139-156.    Indeed, despite some limited inconsistencies, the hours worked reflected in the

Consolidated Summary Chart are reasonably supported by evidence in the record and testimony

at trial, and close to the number of hours reflected in the "Certified Payrolls" numbers proffered

by the CRC and Travelers defendants.   In accordance with this Court's order, Minute Order, June

24, 2015, the plaintiffs identified the specific sources for all of the information in the

Consolidated Summary Chart, including copies of checks given to plaintiffs, Pls.' Ex. 1, time

sheets produced by CRC's own foreman, Enrique Sanz, Pls.' Ex. 4, copies of CRC's Certified

Payrolls, J. Ex. 10, contractor's daily reports produced by Cespedes and Sanz, J. Ex. 11,

Cespedes's handwritten records, J. Ex. 12, and interrogatories from plaintiffs to JCI, J. Ex. 8.

*See* Pls. & JCI's Resp. June 24, 2015 Minute Order, ECF No. 133.   The Court therefore finds

that the Consolidated Summary Chart sufficiently reflects the most accurate total number of

hours worked without pay for each plaintiff, based on the comprehensive set of records on which

it is based.

### H.    Credibility Assessments

Given this Court's "opportunity to judge the witnesses' credibility," FED. R. CIV. P.

52(a)(6), the witnesses' demeanor at trial informs the factual findings set out above, as well as

the conclusions of law, *infra*.  The majority of the witnesses were the twelve testifying plaintiffs,

who each generally testified credibly in a straightforward and careful manner about their work on

the Project and their frustration at not being paid for their labor.  As one of the plaintiff's

summarized their collective view: "We all waited.  We worked.  We continued to work.  All of

us had no money.  We were just nice. . . .  We need our money.  That money is owed to us for our

sacrifice or work, and we're even not making -- we're not making any money because we have to

be here."  Trial Tr. at 290 (testimony of Gerardo Moya).  Enrique Sanz, who was CRC's foreman

on the Project and has since left CRC, Pls.' Ex. 7 (Carlos Calderon Dep.) at 13, similarly provided credible testimony.

By contrast, Edgar Butler, CRC's accountant for over twelve years, testified in a manner designed to protect his business relationship with Carlos and Ana Calderon, such that his memory failed and he could not recall what he discussed with the Calderons about the classification changes for the plaintiffs, Trial Tr. at 557, incorrect payrolls, *id*. at 558-59, or any instructions he received regarding these matters, *id.* at 560.  His testimony was of limited credibility.

The defendant Jacinto Cespedes provided testimony that was inconsistent, shifting and occasionally unresponsive.  *See, e.g.,* Trial Tr. at 467-69 (Jacinto Cespedes testifying that he had written a document, followed immediately by a refusal to admit whether the document was in his own handwriting, and finally his denial that he had written the document).  Cespedes' testimony regarding overtime work, which the workers performed on a number of Saturdays, was particularly confusing about whether any promises were made to him to pay for the overtime Saturday work and, if so, who made the promises.  *See id.* at 337–42.  He testified that he spoke to Enrique Sanz and he had spoken to Calderon, "who had said that Whiting-Turner needed us to work on Saturdays," *id*. at 337, and agreed with a question posed to him by the Court that it was correct that "no one ever told you that they would cover the costs for Saturday work." *id*. at 338. Yet, he then testified that Sanz had promised to pay for the overtime on Saturdays, *id*. at 340, and also that Sanz told him that "Whiting-Turner had to pay" for the Saturday overtime work, *id*. at 340–41.  Cespedes' testimony is accepted principally only where bolstered by documentary evidence or his testimony amounts to statements against his own interest (*e.g.*, his admissions

that he reclassified workers to reduce labor costs and that he hired undocumented workers also to reduce labor costs).

Neither Ana nor Carlos Calderon testified at trial. Their deposition testimony is, at best, contradictory, and, at worst, strains credulity. Both Calderons claimed particularly poor memories related to the events giving rise to this lawsuit. For example, Ana Calderon testified that she signed the payroll documents, but that CRC's accountant Butler was mainly responsible for their review, contrary to the testimony of Butler and Carlos Calderon. Pls.' Ex. 6, at 14-15; *cf.* Trial Tr. at 544 (Butler testifying that Ana Calderon reviewed payroll records); Pls.' Ex. 7, at 10 (Carlos Calderon stating that Ana Calderon was in charge of accounting). When asked whether she understood that she signed the payroll forms subject to civil or criminal prosecution, Ana was evasive and ultimately answered that she could not recall if, at the time of signing, she understood that such penalties existed. *Id.* at 36-40. She confirmed that Jacinto Cespedes "came to the office very . . . frequently," *id.* at 47, but denied knowledge of his exact reasons for visiting the office. *Id.* ("I normally wouldn't see him. But I believe he came in, and he would bring the payroll; if there were some bills, and he would pick up the release, if there were any checks"."). She also denied knowing for a fact if he was paid, despite her role in signing the payroll records. *Id.* at 47‑48.

Carlos Calderon testified that he understood that he was required to pay workers "consistent[] with the Department of Labor's prevailing wages" at the time of the work, *id.* at 24, but denied (1) knowing how individuals were classified on the job, (2) discussing with Jacinto Cespedes how to classify the workers on the project, *id.* at 30-32, or (3) telling him to pay the workers at a lower scale, *id.* at 46. At the same time, he testified that, as far as he knew, the proper classification for workers on the Project was as carpenters. *Id.* at 32. Carlos Calderon

also denied that he talked to Jacinto Cespedes about the number of workers needed on the job, despite multiple emails he received from Whiting-Turner directing him to add more workers to the job site. *Id.* at 53-61.

In sum, the testimony by the individual defendants, either at trial by Jacinto Cespedes or in depositions by Ana and Carlos Calderon, was generally not credible.

## III.   CONCLUSIONS OF LAW

In reaching conclusions of law, the Court evaluates the evidence to determine whether the plaintiffs and cross-claimants have established each element of their respective claims by a preponderance of the evidence. *See Clark v. Feder Semo & Bard, P.C.*, 895 F. Supp. 2d 7, 29 (D.D.C. 2012) ("The Court reviews the evidence under the 'default rule for civil cases,' the 'preponderance of the evidence' standard.") (citing *Cigna Corp. v. Amara*, 563 U.S. 421, 443 (2011)); *see also Ascom Hasler Mailing Systems, Inc. v. United States Postal Service*, 885 F. Supp. 2d 156, 181 (D.D.C. 2012). The plaintiffs' claims are addressed first, before turning to the defendants' cross-claims.

### A.   PLAINTIFFS' CLAIMS

As noted, the plaintiffs assert claims under the FLSA, DCMWRA and DCWPCA. Each of these statutes is briefly reviewed, before assessing whether the plaintiffs have proven, by the requisite preponderance of the evidence, their claims against the defendants.

#### 1. Statutory Framework

The DCMWRA and the DCWPCA are construed consistently with the FLSA with respect to determining the liability of an employer. *See Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1, 5 n.2 (D.D.C. 2010); *Del Villar v. Flynn Architectural Finishes*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009); *see also* D.C. Code § 32–1002 (defining "employ," "employer," and

"employee" with language very similar to FLSA). Thus, determinations of employer or employee status under the FLSA apply equally under the District of Columbia wage laws.

*(a) Fair Labor Standards Act*

The FLSA provides that "[e]very employer shall pay to each of his employees . . . who in any workweek is engaged in commerce or in the production of goods for commerce . . . not less than the minimum wage," 29 U.S.C. § 206(b), and to pay overtime compensation, "at a rate not less than one and one-half times the regular rate" at which an employee is usually paid, for time worked in excess of forty hours per week, *id*. at § 207(a)(1). *See Cannon v. District of Columbia*, 717 F.3d 200, 204 (D.C. Cir. 2013) ("An employee is entitled to the federal minimum wage and overtime unless specifically exempted by the FLSA."); *Robinson-Smith v. Gov't Emps. Ins. Co*., 590 F.3d 886, 892 (D.C. Cir. 2010) (same).

While the FLSA does not specify when wages must be paid, the Supreme Court has pointed to the liquidation damage provision of the FLSA as "congressional recognition that failure to pay the statutory minimum on time may be so detrimental to maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). The Court further stressed that "[t]he necessity of prompt payment to workers of wages has long been recognized by Congress as well as by state legislatures." *Id*. at n.20. Following this lead, courts have found that the FLSA encompasses a requirement that wage payments due to employees must be paid promptly and at regular intervals. *See Rogers v. City of Troy, N.Y.,* 148 F.3d 52, 55-56 (2d Cir. 1998); *Biggs v. Wilson*, 1 F.3d 1537, 1541 (9th Cir. 1993) ("[T]he FLSA is violated unless the minimum wage is paid on

the employee's regular payday"); *U.S. v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 491 (2d Cir. 1960) ("[W]hile the FLSA does not expressly set forth a requirement of prompt payment, such a requirement is clearly established by the authorities.").

In addition to recovery of unpaid minimum wages or overtime compensation, an employee prevailing in an FLSA action is entitled to "an additional equal amount as liquidated damages." *Dove v. Coupe,* 759 F.2d 167, 175 (D.C. Cir. 1985); *see also Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 285 (D.D.C. 2015) ("An FLSA violator is generally liable for all unpaid compensation as well as 'an additional equal amount as liquidated damages.'" (citing 29 U.S.C. § 216(b))).  "By authorizing liquidated damages, Congress sought to compensate the aggrieved employee for the employer's delay and to restore him to a position as if the employer had not failed in its obligation to pay in a timely manner that compensation to which he was entitled." *SSA, Baltimore v. FLRA*, 201 F.3d 465, 469 (D.C. Cir. 2000).

*(b) D.C. Wage Payment and Collection Act*

The DCWPCA requires every "employer" to "pay all wages earned to his employees at least twice during each calendar month, on regular paydays designated in advance by the employer," and provides, in relevant part, "that an interval of not more than 10 working days may elapse between the end of the pay period covered and the regular payday designated by the employer."  D.C. Code § 32-1302 (2012); *see Walker v. Thomas*, 2015 U.S. Dist. LEXIS 156849, *7-*8 (D.D.C. Nov. 20, 2015) (noting that DCWPCA "requires employers to pay any wages due to an employee, whether at the minimum rate, or at a higher rate, in regular intervals.").  The DCWPCA further provides that "[w]henever an employee," without a written employment contract "quits or resigns, the employer shall pay the employee's wages due upon the next regular payday or within 7 days from the date of quitting or resigning, whichever is

earlier." *Id*. § 32-1303(2).  A plaintiff who proves that a defendant has violated § 32-1302 may

recover unpaid wages, liquidated damages, attorneys' fees and costs, *id*. § 32-1308, and, if a

plaintiff proves that a defendant has violated § 32-1303, the plaintiff may additionally recover,

"as liquidated damages, 10 per centum of the unpaid wages for each working day" the defendant

fails to pay after the defendant was required to pay, "or an amount equal to the unpaid wages,

whichever is smaller," *id*. § 32-1303(4).

*(c) D.C. Minimum Wage Revision Act*

The DCMWRA sets the minimum wage "to be paid to any employee by any employer in

the District of Columbia."  D.C. Code § 32-1003(a).  In addition, the DCMRWA requires

compensation at the rate of 1.5 times the employee's normal wages for employees working more

than 40 hours a week.  § 32-1003(c).  The DCMRWA provides that "[a]ny employer who pays

any employee less than the wage to which that employee is entitled under [the DCMRWA] shall

be liable to that employee in the amount of the unpaid wages, and an additional amount as

liquidated damages."  D.C. Code Ann. § 32-1012 (1993).[14]

An employee may not recover for nonpayment of wages separately under the FLSA, the

DCMWRA, and the DCWPCA since that would result in a double (or triple) recovery for unpaid

wages*. See Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318,

333 (1980) ("[C]ourts can and should preclude double recovery by an individual."); *see also*

*Pleitez v. Carney*, 594 F. Supp. 2d 47, 51 (D.D.C. 2009) (calculating recovery for plaintiff with

claims under the FLSA, DCMWA and DCWPCA and granting only one sum equal to highest

amount plaintiff could recover under any of the statutes for the same injury).  Moreover, a

prevailing employee may not stack recovery of liquidated damages under each of the three

---

[14]      The DCMWRA has been revised since this action was commenced.  All citations to the D.C. Code are to
the Code in effect at the time this suit was filed, unless otherwise noted.

statutes, but is entitled only to the highest amount of liquidated damages permitted under any one

of the three statutes.  *See Pleitez*, 594 F. Supp. 2d at 51 (holding recovery under FLSA,

DCMWA and DCWPCA was limited to a single award of liquidated damages equal to the total

owed unpaid wages); *see also Encinas v. J.J. Drywall Corp.*, 840 F. Supp. 2d 6, 8 (D.D.C. 2012)

(same).

### 2.     Liability

Plaintiffs claim that JCI, CRC, Jacinto Cespedes individually, and Carlos and Ana

Calderon individually, were their joint employers.  While the parties all agree that the plaintiffs

were "employees" within the meaning of the FLSA, PTC Tr. at 88-90, and that JCI was the

plaintiffs' employer, Cespedes and the CRC defendants dispute that they were plaintiffs' joint

employers under the FLSA, the DCMWPA, and the DCWPRA.  As explained below, after

review of the pertinent statutory definitions and caselaw and the record in this case, the Court

concludes, first, that CRC and the individual defendants were joint employers of the plaintiffs,

and, second, that Travelers' liability under the surety bond is coextensive with that of CRC.

### (a) Determination of "Employer" Status

The FLSA defines several key terms for coverage under the statute:  an "employee" is

defined as "any individual employed by an employer," 29 U.S.C. §§ 203(e)(1); an "employer," is

defined to "include[] any person acting directly or indirectly in the interest of an employer in

relation to an employee . . . ," *id.*, § 203(d); and the term "employ" means "to suffer or permit to

work," *id.*, § 203(g).  These definitions have been described as "generally unhelpful," *Henthorn*

*v. Department of Navy*, 29 F.3d 682, 684-685 (D.C. Cir. 1994), and the definition of "employee,"

in particular, as qualifying "as a mere 'nominal definition' that is 'completely circular and

explains nothing,'" *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444

(2003) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992)). Yet, at the same time, these definitions must be construed broadly to effectuate the remedial purposes of the statute.  *See Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 10 (D.C. Cir. 2001).

The Supreme Court has provided guidance "to fill the gap in the statutory text" by looking to "'the conventional master-servant relationship as understood by common-law agency doctrine,'" *Wells*, 538 U.S. at 444-445 (quoting *Darden*, 503 U.S. at 322-23), and "examining the "economic reality" of the relationship between the putative employee and employer, *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 300-301 (1985) ("The test of employment under the [FLSA] is one of 'economic reality.'"); *Goldberg v. Whitaker House Cooperative,* Inc., 366 U.S. 28, 33 (1961) (noting that "'economic reality' rather than 'technical concepts' is to be the test of employment").  The over-arching inquiry is whether the defendant is "the kind of person that the common law would consider an employer." *Wells*, 538 U.S. at 445.

The economic reality inquiry involves consideration of various factors, including "the hiring party's right to control the manner and means by which the product is accomplished[;] ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.'" *Well*s, 538 U.S. at 445 n.5 (quoting *Darde*n, 503 U.S. at 323-24 (quoting *Cmty. Ctr. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-752 (1989), and citing Restatement (Second) of Agency § 220(2) (1958)).  Consistent with the Supreme Court's articulation of the economic reality test,

the D.C. Circuit has enumerated five specific factors relevant to identifying a defendant's status as an "employer" under the FLSA: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship and (5) the extent to which the work is an integral part of the employer's business." *Morrison*, 253 F.3d at 11. "No one factor standing alone is dispositive." *Id*. Instead, the totality of the circumstances of the relationship between the parties must be evaluated "to determine whether the putative employer has the power to hire and fire, supervise and control work schedules or conditions of employment, determine rate and method of pay, and maintain employment records." *Ventura*, 738 F. Supp. 2d at 5 (quoting *Del Villar v. Flynn Architectural Finishes*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009)).

Notably, application of this test may show that more than one "employer" is liable for violations of the FLSA. *Ventura*, 738 F. Supp. 2d at 5. Moreover, an individual may be held personally liable, as the FLSA's definition of employer is broad enough to "encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Reich v. Circle C. Invs. Inc.*, 998 F.2d 324, 329 (5th Cir. 1993).

### b) CRC's Status as an Employer

CRC denies being the plaintiffs' employer, but consideration of the totality of the circumstances shows otherwise. First, CRC had significant, if not absolute, control over the both timing and conduct of plaintiffs' work. Enrique Sanz testified that he would typically spend "the whole day" supervising the workers on the Project, walking around each level of the building to

"be sure that everybody is doing it the right way," and complying with applicable rules for a federal construction project. Trial Tr. at 105–06. Carlos Calderon testified that Sanz, as CRC's foreman, was responsible for deciding who would come into work, regardless of the requests made by Whiting-Turner. *Id.* at 63-69.[15] Plaintiffs also testified that they performed their work on the Project under the daily supervision and instruction of both Jacinto Cespedes and Enrique Sanz, both of whom the plaintiffs considered to be their bosses. *Id.* at 178–79 (Luis Rocha Moya), 190 (Peter Soto), 217, 223 (Wilson Perez Zapata), 240–41 (Edgardo Pablo Terceros), 251–52 (Freddy Paz Perez), 261 (Juan Amurio Quiroz), 263 (Jose Lenin Rocha Quiroz), 273 (Mario Moya), 284–86 (Gerardo Moya), 293, 300 (Jose Rocha Cespedes), 302 (Samuel Lopez). Indeed, Sanz admitted that workers would ask or tell Sanz if they needed to take breaks or leave early. *Id*. at 109.

Further, Sanz was responsible for ensuring that all the workers were equipped with the proper equipment, including ladders and scaffolding, which equipment was owned by CRC and needed for the workers on the Project. *Id*. at 100–01, 130–31, 171–72. Sanz was also responsible for conducting "safety meetings" with the workers, coordinating with the CRC office regarding materials needed for the work, coordinating with the general contractor regarding where work would start or continue, and directing the workers "where to go, what to do, what is the material." *Id*. at 100–01, 131.

CRC points out that CRC could not terminate the plaintiffs' relationship with JCI but only remove an employee from the Project work site, but that CRC never asked or told JCI to

---

[15]     CRC argues that because the hours during which plaintiffs could be on site were set by Whiting-Turner, CRC did not "establish the hours of work." COL CRC v. Pls. at 7. Even if Whiting-Turner set the hours during which work could be done, Calderon emphasized in his deposition that CRC determined if and when plaintiffs came to the site, regardless of the schedule set by Whiting-Turner. Pls.' Ex. 7 at 52; 59, 67. In other words, CRC decided, the hours and number of workers needed on the site each day.

fire an employee.  COL Travelers' at 5; COL CRC v. Pls. at 6-7.  This ignores, however, the

CRC foreman's admission that CRC had the authority to "send . . .  home" employees who

violated safety rules, Trial Tr. at 170, and to fire a worker sent by JCI, *id.* at 169, making

irrelevant that no such worker was actually fired from the job site.  In addition, CRC, through

Carlos Calderon, encouraged JCI to hire undocumented workers and to reclassify workers at

lower wage rates, which JCI did.  Trial Tr. at 346, 360-62.  This significant amount of control

over the plaintiffs' work, in terms of schedules, wage rates, tools, and work performance, weighs

heavily in favor of finding CRC to be plaintiffs' joint employer under the "economic reality"

test.

Second, the plaintiffs did not have independent opportunity for profit or loss based on the

successes (or failures) of CRC and JCI.  The contracts between CRC and JCI, as well as the

contract between CRC and the general contractor, were for fixed prices, Trial Tr. at 323; J. Ex. 2

at 4, J. Ex. 3 at 4, and, consequently, the plaintiffs' pay would not change if the project were

completed faster or for less cost than otherwise anticipated.  In short, the plaintiffs were not in a

position to profit or invest in the business no matter how much effort they put into their work on

the project.  This factor also weighs in favor of finding that plaintiffs were employees of CRC.

Third, while the plaintiffs had pre-existing skills in the building trade to perform work as

carpenters, their work required the input and direction of Enrique Sanz, who had the blueprints

for the work and served as the liaison among Whiting-Turner, CRC and JCI.  While coordination

for the work of various subcontractors on a project is necessary, and providing such coordination

does not automatically create an employer relationship under the FLSA, Sanz's role on-site and

CRC's directions to JCI were far more significant than merely coordination, in part because CRC

did not provide JCI or any of the plaintiffs with the plans for the job that would have allowed

them to work on the Project unsupervised.  As such, there was no incentive or reward for the plaintiffs to take initiative and do work outside of the scope of their supervision by Sanz.  While the work itself may have required a specialized level of training and knowledge, the specification of where, when and how to perform the work was controlled by CRC and Sanz.  In this respect, Sanz's level of supervision exceeded the bounds necessary merely to coordinate the various dynamic and evolving tasks on a construction site, and he played the role of a direct supervisor of plaintiffs, a responsibility he shared with Carlos Calderon and Jacinto Cespedes.  This factor weighs in favor of finding that CRC is plaintiffs' employer.

Fourth, the more permanent the employment relationship, the more likely a court will find an employee/employer relationship. *Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 150 (D.D.C. 2011).  In this case, the plaintiffs did not have a long work history with either JCI or CRC, and as reflected in the payroll records, many of the plaintiffs did not work regular hours or consistent days on the project. *See* J. Ex. 11 (Daily Contractor Reports).  These facts point to a transient working relationship between the plaintiffs and CRC, but "sometimes work[ing] irregular hours … does not preclude a finding" of an employment relationship "under the economic reality test." *Morrison,* 253 F.3d at 12.  In any event, even if a "factor tips against employee status . . . this single factor is certainly not dispositive." *Thompson*, 779 F. Supp. 2d at 150.

Finally, the plaintiffs performed an integral part of CRC's work on the Project and, thereby, had a significant role in CRC's business, given Carlos Calderon's admission that most of the work necessary to fulfill the Prime Subcontract was performed by the JCI-affiliated workers, including the plaintiffs.  Pls.' Ex. 7 (Carlos Calderon Dep.) at 59.  This conclusion is reinforced by the fact that, after plaintiffs quit working, CRC was unable to complete its work on

the project without bringing in workers who were admittedly its employees, whom CRC classified as carpenters on the Project. Trial Tr. at 555. CRC's fulfillment of its contractual obligations depended on the labor the plaintiffs provided and this factor weighs in favor of finding CRC to be plaintiffs' employer under the FLSA.

The totality of the circumstances shows that CRC's foreman was the plaintiffs' on-site supervisor in control of the plaintiffs' schedules, tasks and equipment and, further, that Carlos Calderon was instrumental in having JCI reclassify workers at lower wage rates and hiring undocumented workers, whom both JCI and CRC believed could be underpaid because they were not in the country legally. Under the broad reading to be applied to the FLSA as a remedial statute, the Court concludes that CRC exercised a significant level of control over the plaintiffs' working conditions and was one of the plaintiffs' employers on the project. *Morrison,* 253 F.3d at 10.[16]

### (c) Individual Liability of Cespedes and the Calderons

The individual defendants, Jacinto Cespedes and the Calderons, deny that they were the plaintiffs' employers under the FLSA and the District of Columbia labor laws. Nevertheless,

---

[16] This conclusion is bolstered by the DOL Settlement Agreement, in which CRC agreed to pay wages owed to the plaintiffs and others in a negotiated amount. This agreement expressly states that "[CRC] does not concede it employed five (5) of the employees included in Exhibit A," even though "[t]he WHD continues to assert that these five individuals were employed by the Company [CRC] and will distribute back wages to them as owed." Defs.' Ex. 18 (DOL Settlement Agreement) ¶ 10. By expressly contesting the status as employees of the five named non-plaintiffs, CRC implicitly acknowledged that the remaining employees listed in Exhibit A, among whom are the thirteen plaintiffs in this suit, were employed by the Company. CRC disagrees that the DOL Settlement Agreement can be construed as an implicit concession that the plaintiffs were its employees because "[t]he issue between Whiting-Turner, [CRC] and DOL in regard to the five individuals in para. 10 of the DOL Settlement involved the position of [CRC] that these named individuals were subcontractors to [JCI], not employees of [JCI]," CRC's Resp. Minute Order, ECF No. 138 at 3, and the Davis-Bacon Act "essentially creates strict liability for unpaid wages for any worker on the Project that is not paid the correct pay rate," *id.* This opaque explanation begs the question of whether CRC acknowledged the plaintiffs as employees to whom the company owed back wages to resolve the WHD investigation, since it merely distinguishes the status of five other individuals. In the Court's view, CRC's explicit protest as to these five individuals may be construed as an implicit recognition of the company's obligations as an employer to the plaintiffs.

"[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Ruffin v. New Destination*, 800 F. Supp. 2d 262, 269 (D.D.C. 2011) (*citing Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)); *see also Wilson v. Hunam Inn, Inc*., 126 F. Supp. 3d 1, 5-6 (D.D.C. 2015) (same). In evaluating whether a corporate officer has the requisite operational control, the factors relevant to ascertaining employer status are relevant as well as the ownership interest of the corporate officer. *Ventura*, 738 F. Supp. 2d, at 5–6. This is because, first, a "company's profits . . . inure directly to an individual with an ownership interest, meaning that the individual "employs" the worker in a very concrete and literal sense." *Manning v. Boston Med. Ctr. Corp*., 725 F.3d 34, 48 (1st Cir. 2013); *see also Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 966 (6th Cir. 1991) (holding individual liable where "the evidence clearly demonstrates that [individual] was the 'top man' ... and the corporation functioned for his profit"). Second, a corporate officer with operational control has in a very direct sense the ability to "caus[e] the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits." *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir. 1998).

### i.     The Calderons

Carlos and Ana Calderon, who are President and Vice President, respectively, and the sole owners of CRC, do not dispute that they have complete operational control over CRC. Second Stips. ¶¶ 4-6. This finding alone weighs heavily in favor of finding that, since CRC is a joint employer of the plaintiffs, so too are the Calderons. As the sole owners of CRC, the Calderons directly profited from the work performed by, and underpayment of, plaintiffs, and their decisions regarding payments to JCI directly affected the non-payments to the plaintiffs.

*See Manning*, 725 F.3d at 48.  Moreover, the Calderons both supervised and controlled the

Project: CRC's foreman Enrique Sanz reported directly to the Calderons, and Carlos Calderon

decided the number of workers on-site each day based on Sanz' recommendation and

communications from Whiting-Turner.  *See supra* II.C; Pls.' Ex. 7 (Carlos Calderon Dep.) at 65-

80.  Jacinto Cespedes testified that both Carlos and Ana recommended that he lower wages for

the workers in order to employ workers for more time and less money, Trial Tr. at 346-47, and

that Carlos Calderon suggested that Cespedes hire undocumented workers to reduce the cost of

labor for both JCI and CRC, *see supra* II.E; Trial Tr. at 360-364 (Cespedes testimony that he

hired undocumented workers "at Calderon's suggestion.").

 In terms of their power over wages paid to the plaintiffs, the Calderons controlled the

payments by CRC to JCI, instructing Enrique Sanz to under-report progress on the project

resulting in lower payments to JCI.  *See supra* II.E; Trial Tr. at 117.  Further, when the plaintiffs

threatened to walk off the Project, Calderon himself met with plaintiffs on at least two occasions

in an effort to persuade them to remain on the job site by promising to pay the wages owed to

them for the work performed under CRC's contract with Whiting-Turner.  *See supra* II.F; Trial

Tr. at 127-28.  Given the Calderons' strong financial interest in CRC and the significant level of

control they exercised over plaintiffs' pay rate, work schedule, on-site tasks, performance

assessment and continued employment on the Project, either directly or through the Project

Foreman, whom they directly supervised, the Calderons qualify as plaintiffs' employers and are

joint and severally liable for debts owed to the plaintiffs under the FLSA and DC wage laws.

*ii.* *Jacinto Cespedes*

 Jacinto Cespedes co-owned JCI with his wife and admits that JCI was the plaintiffs'

employer.  Trial Tr. at 364; 445.  Similar to the Calderons, JCI's profit was entirely for

46

Cespedes's family's benefit and any financial gains to JCI on the Project also inured to Cespedes' benefit.[17]  When Cespedes did not receive enough money to pay the workers and compensate himself and JCI, Cespedes chose to retain some of the money he had been paid for himself, rather than pay plaintiffs for their unpaid work.  *See* J. Ex. 21 (showing checks to JCI from CRC that were cashed even after JCI stopped paying the plaintiffs).  As evidenced by his admitted failure to pay plaintiffs their full wages at regular intervals, he had the ability "to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits."  *Baystate*, 163 F.3d at 668.  In addition, Cespedes controlled the hiring of the plaintiffs through JCI and participated in their supervision on-site at the Project.  Trial Tr. at 246; Second Stips. ¶ 1. Cespedes' role in hiring, supervising and deciding on payments to the plaintiffs, along with his ownership with his wife of JCI, a conceded employer of the plaintiffs, provides ample evidence that he was their employer and is individually jointly and severable liable to plaintiffs, in addition to the CRC defendants and JCI.[18]

### *(d) Travelers' Liability*

In pre-trial rulings denying Travelers' motion to dismiss the claim against it, the Court held that the plaintiffs stated a plausible claim against Travelers since they were potential third party beneficiaries of the Payment Bond between Travelers and CRC, *see* Mem. and Order, July 10, 2013 ("July 2013 Mem. & Order"), at 9, ECF No. 58, and that Travelers's obligation under the bond would be triggered only if CRC "had an obligation to pay the plaintiffs for their work," *id.* at 11. [19]  In other words, "Travelers' obligation under the payment bond is co-extensive with

---

[17]    JCI is no longer in existence. Trial Tr. at 394.

[18]    Cespedes makes the conclusory assertion that the plaintiffs have failed to prove by a preponderance of evidence his status as the plaintiffs' employer under the FLSA.  COL – JCI (re: Pls.) at 4-5.  As the preceding discussion makes clear, the Court disagrees.

[19]    The Court likewise denied plaintiff's cross-motion for partial summary judgment on the issue because "[a]lthough the Court [held] that the plaintiffs are potential third-party beneficiaries of the payment bond, that does

Calderon's obligation to pay 'all persons supplying labor… in the performance of the said

Contract.'"  *Id.* (quoting J. Ex. 5, Travelers' Payment Bond at 1).  Shortly before trial, Travelers

and the plaintiffs raised the issue whether Travelers would be liable under the surety bond for

attorneys' fees and liquidated damages.  Travelers' Resp. to June 29, 2015 Order, ECF No. 139

at 4-6; Pls.' Consol. Resp. to June 29, 2015 Order, ECF No. 145 at 16-18.  As noted *supra*, in

Part I.C.3, ruling on this issue was reserved until resolution was required by a finding that CRC

was in fact liable as the plaintiff's employer under the FLSA, thereby triggering Travelers'

obligation under the Payment Bond.  Trial Tr. at 78.  That time has come.

Travelers argues that, even if CRC is liable to the plaintiffs as an employer, the surety

bond between Travelers and CRC does not extend to cover any award of statutory liquidated

damages or attorneys' fees.  COL Travelers 15-20.  As support, Travelers emphasizes that the

bond covers payments only for "labor," so would cover only unpaid wages owed by CRC to the

plaintiffs. COL Travelers at 17-18.  This argument is simply not supported by the plain language

in the Payment Bond and is contrary to binding caselaw.

The Traveler's Payment Bond provides surety for CRC in the amount of $929,639.00,

which "shall inure to the benefit of all persons supplying labor…in the performance of the said

Contract."  J. Ex. 5, Payment Bond at 2.  The "CONDITION OF THIS OBLIGATION" is that

"it shall remain in full force and effect" if CRC does not "promptly make payments to all persons

supplying labor…in the performance of said Contract and any and all modifications of said

Contract that may hereafter be made…"  *Id.* at 1 (capitalization in original).  A payment bond

"must be measured by the conditions stated in the bond."  *Goldberg, Marchesano, Kohlman, Inc.*

*v. Old Republic Sur. Co.*, 727 A.2d 858, 860–61 (D.C. 1999); *see United States Shipping Bd.*

---

not automatically render Travelers liable to the plaintiffs, regardless" of CRC's liability.  July 2013 Mem. & Order
at 10.

*Merchant Fleet Corp. v. Aetna Casualty & Surety Co.*, 98 F.2d 238, 241 (D.C. Cir. 1938)("The terms of the policy constitute the measure of the insurer's liability . . . ."); *accord Hunt Constr. Group, Inc. v. Nat'l Wrecking Corp.*, 587 F.3d 1119, 1120-21 (D.C. Cir. 2009) (applying District of Columbia law to interpretation of terms of performance bond).  Nothing in Traveler's Payment Bond's operative language limits the surety's obligation only to payments owed by CRC for "labor" but more broadly covers *any* payments owed to the "persons supplying labor." Certainly, no language in the Payment Bond expressly excludes awards for liquidated damages or attorneys' fees that may otherwise be owed by CRC to beneficiaries such as the plaintiffs.[20]

The Supreme Court's decision in *United States ex rel. Sherman v. Carter,* 353 U.S. 210 (1957), is instructive, if not dispositive, on this issue, though this precedent was neither cited nor discussed by the parties.  The *Carter* Court addressed "the extent of the liability of the surety on a payment bond furnished by a contractor, as required by the Miller Act, for the protection of persons supplying labor for the construction of federal public buildings," 353 U.S. at 211, and, specifically, considered whether recovery on the bond was limited to "wages" or also covered the plaintiffs' "claim for liquidated damages, attorneys' fees, court costs and other related expenses of this litigation," *id.* at 220.  In *Carter*, an insolvent contractor on a federal construction project failed to pay "required contributions to [a] health and pension fund,"

---

[20]       A finding that the language of the bond is ambiguous would not help Travelers. "[W]hen ambiguity in terms arises, the 'rule [is] that the obligation is to be construed against the surety and in favor of the beneficiaries of the bond.'" *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 188 (D.D.C. 2011) (quoting *U.S. Plywood Corp. v. Cont'l Cas. Co.*, 157 A.2d 286, 288 (D.C.1960)); *Revere Copper & Brass, Inc. v. Overseas Private Inv. Corp.*, 628 F.2d 81, 82-83 (D.C. Cir. 1980) (noting rule of construction *contra proferentem* "that ambiguities in insurance contracts are resolved favorably to the insured [,which rule] developed in recognition that insurance policies are usually written by the insurer, and the insurer ought not be allowed to benefit from any ambiguities in the language which it chose").  Thus, any ambiguity in the broad Payment Bond language would be construed to favor the plaintiffs and to cover all amounts owed by CRC to the plaintiffs, including unpaid wages, liquidated damages and attorneys' fees.

prompting the plaintiffs, as trustees of the pension fund, to seek from the contractor's surety "the balance due . . . plus liquidated damages, attorneys' fees, court costs and expenses." *Id*. at 212.

Using language very similar to that in the Travelers' Payment Bond at issue here, the bond reviewed in *Carter* "insure[d] prompt payment 'to all persons supplying labor and material in the prosecution of the work provided for in said contract,'" *id*. at 216 (quoting bond), and provided for the surety's liability "at least coextensive with the obligations imposed by the [Miller] Act" for "the bond to have its intended effect" of "meet[ing] the statutory requirement of the Act," *id*. at 215-16.  Noting that "[t]he Miller Act … is highly remedial in nature," the Supreme Court explained this law "is entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects," and that the "essence of [the] policy is to provide a surety who. . .  must make good the obligations of a defaulting contractor to his suppliers of labor and material." *Id.* at 216-217.[21]  Consequently, the *Carter* Court rejected the surety's position that recovery under the bond was limited to "wages," *id*. at 217, and instead held that the surety was required to compensate the employee for unpaid amounts of pension contributions, which were part of the workers' "compensation for labor," *id*. at 218. In addition, most pertinent here, the *Carter* Court found the plaintiffs' claims for "liquidated damages, attorneys' fees, court costs and other related expenses of this litigation" to have "equal merit," since these costs "form a part of the consideration which [the contractor] agreed to pay for services performed by his employees" and

---

[21]        The *Carter* Court highlighted the statutory obligation, under the Miller Act, 40 U.S.C. § 270a(a)(2), for a bond covering "the sum or sums justly due" suppliers of material or labor, as furthering the underlying policy to protect workers. 353 U.S. at 212. While the Miller Act does not apply to second tier subcontractors, such as JCI, s*ee J. W. Bateson Co. v. United States*, 434 U.S. 586, 587 (1978) (interpreting the Miller Act, 40 U.S.C. § 270a(a)(2), requirement that a prime contractor on a federal construction project post a payment bond to protect those who have a direct contractual relationship with either the prime contractor or a "subcontractor," as not applying to a "sub-subcontractor"), the FLSA is animated by the identical policy of protecting workers.

"[i]f the employees are to be 'paid in full' … these items must be included." *Id.* at 220.[22]  The

Court reasoned that the "[a]s long as [the contractor's] obligations relating to compensation for

labor have not been satisfied, his employees will not have been 'paid in full' and the Miller Act

will not have served its purpose." *Id*. at 218.[23]  In other words, the surety carries the same

obligation as the contractor's payment obligations to workers under applicable law and a bond

broadly ensuring payments "to all persons supplying labor."

Similarly, in *Overnight Motor Transp. Co. v. Missel*, the Supreme Court held that

liquidated damages for failure to pay under the FSLA are "compensation[,] not a penalty or

punishment by the Government."  316 U.S. 572, 583 (1942), *superseded by statute on other

grounds as recognized in Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985).  This

is because "[t]he retention of a workman's pay may well result in damages too obscure and

difficult of proof for estimate other than by liquidated damages." *Id.* at 583–84.  While

*Overnight Motor* did not concern a surety bond, this decision reinforces the conclusion that

liquidated damages do not represent a penalty falling outside the scope of the Payment Bond, but

are part of the compensation owed to plaintiffs for their work on the Project.  Exclusion of

liquidated damages from the amounts plaintiffs may recover for their labor would defeat a key

purpose of the FLSA, which is to make the plaintiffs whole and avoid the difficult calculation of

how the nonpayment of wages damaged the plaintiffs.

---

[22]     The Supreme Court in *F. D. Rich Co., Inc. v. United States*, 417 U.S. 116, 130-31 (1974), held that an award of attorney fees under the Miller Act would ordinarily be an inappropriate abrogation of the American rule, and other courts have read *F. D. Rich Co*. as undermining the attorneys' fees portion of the holding in *Carter*. *See, e.g.*, *Ragan v. Tri-County Excavating*, 62 F.3d 501, 514 (3d Cir. 1995). By contrast to the Miller Act, however, the FLSA expressly entitles prevailing plaintiffs to recover reasonable attorneys' fees and reflects the policy that such fees contribute to furthering of the statutory policies. *See* 29 U.S.C. § 216(b) ("The court . . . shall . . . allow a reasonable attorney's fee to be paid by the defendant" to a prevailing plaintiff).

[23]     Although the parties in *Carter* had expressly stipulated that liquidated damages and attorney fees were compensation for labor, 353 U.S. at 220, this was mentioned by the Supreme Court as only a factor, not the principle reason for its holding.

This Supreme Court guidance provides strong support for construing the broad language in the Payment Bond to cover not only the plaintiffs' unpaid wages, but also any amounts of liquidated damages and attorneys' fees necessary to make them whole and further the remedial purposes of the FLSA.

Despite this Supreme Court precedent, Travelers seizes on the word "labor" in the Payment Bond to argue that this word excludes from the scope of the payment bond any liquidated damages or attorneys' fees that CRC may owe to plaintiffs.  COL Travelers at 18 (arguing that "the term 'labor' as used in the context of a payment bond means wages for physical or manual labor…[and] would not include liquidated damages arising under the FLSA, DCWPCA, or DCMWRA.").  As support, Travelers relies heavily on *A-J Marine, Inc. v. Corfu Contractors, Inc.,* 810 F. Supp. 2d 168 (D.D.C. 2011), but reliance on this case is misplaced for two significant reasons.  COL Travelers at 18-19.  First, by contrast to the instant case, the FLSA and its worker protection policies were not implicated or addressed in *A-J Marine,* and, consequently, interpretation of the bond at issue in that case was divorced from any consideration of the requirements in or policies underpinning the FLSA.

Second, the factual context in *A-J Marine* differs significantly from the case at bar.  The plaintiff suing on the construction payment bond at issue in *A-J Marine* had performed no actual work on the project, other than mobilization and demobilization of equipment to and from the construction site, and the Court held that those costs would in fact have been covered by the bond.  810 F. Supp. 2d. at 189 (finding surety "would be liable…, if at all, in the amount of $10,000 for mobilization and demobilization').  The *A-J Marine* Court drew a line, however, and rejected the plaintiff's effort to recover "lost profits deriving from the breach of contract claim and not from actual costs incurred," *id.* at 187, reasoning, based on the precise language of the

bond, which "contained no express or implied promise to pay breach-of-contract damages," *id*. at 188, that coverage was limited to only work performed and did not cover "work not done," *id*. at 189.  In short, *A-J Marine's* holding that, under the language of *A-J Marine* bond, the surety would be responsible for work performed but not lost profits on work not done, sheds little light here, where the plaintiffs are suing to recover for unpaid wages owed on work actually performed and are statutorily entitled to be made whole, through payment of liquidated damages and attorneys' fees.

Accordingly, Travelers is liable under the Payment Bond for all payments owed by CRC to the plaintiffs, who "suppl[ied] labor… in the performance of the said Contract," and those payments include unpaid wages as well as liquidated damages and attorneys' fees to which the plaintiffs' are entitled.

* * *

In sum, the evidence at trial proves by a preponderance of the evidence that the CRC defendants and the JCI defendants jointly operated as plaintiffs' employers and are, therefore, jointly and severally liable for the damages under the FLSA, the DCMWRA and DCWPCL. *Ventura*, 738 F. Supp. 2d at 35.  Additionally, since Travelers' obligation under the Payment Bond is co-extensive with CRC's obligation to any of the plaintiffs, Travelers is liable up to the amount of the bond.

### 3.  Damages

Computation of the damages owed to the plaintiffs under the FLSA begins with the simple math of multiplying the hours worked on the Project by the applicable wage rate.  *See, e.g., Ventura*, 738 F. Supp. at 23-35 (calculating damages for unpaid wages under the FLSA and DCWPCL).  While JCI and Jacinto Cespedes admit that the plaintiffs were hired and worked as

carpenters on the Project, FOF Table – Pls. v. JCI at ¶ 88, 125, the CRC defendants and

Travelers contest the plaintiffs' classification as "carpenters" and deny that they were entitled to

Davis-Bacon rate wages for carpentry.  *See* FOF – CRC v. Pls. ¶ 139-156.  The Court concludes

that no matter how DOL would classify the plaintiffs' correct wage rate, they are entitled to the

wage rate that they were promised upon being hired and that they reasonably expected applied

over the duration of their work on the Project.[24]  The overwhelming evidence is that the

plaintiffs, with the exception of Gerardo Moya and Mario Moya, as discussed *infra*, had every

reasonable expectation of being paid at the prevailing wages of a carpenter under the wage rates

attached to the First Subcontract.  Joint Ex. 3 (First Subcontract) at APPENDIX 4.

### *(a) Applicable Wage Rate*

Jose Cespedes testified that he was directed by Carlos Calderon to hire workers at the

carpenter wage rate, Trial Tr. at 319; that he hired the plaintiffs at the prevailing wage of

carpenters, *id*. at 342-43, 438; that he believed the proper wages for plaintiffs to be those for

carpenters, *id*. at 343; and that he completed documentation for invoices showing the plaintiffs'

wage rate to be as carpenters, *id*. at 354-55.  Enrique Sanz testified that the plaintiffs never did

"skilled labor" work on the Project.  *Id.* at 136 (stating "No" in response to question whether

"[w]as there ever a time on the project whether they did work that you would call skilled labor

---

[24]     As noted *supra*, Part I.C.2, the Court deferred ruling on whether jurisdiction to determine the proper classification of the plaintiffs under the Davis-Bacon Act is vested exclusively in the DOL, as the plaintiffs insist. *See* Pls.' Mot. Ruling Ct. Jurisdiction, ECF No. 149.  The CRC defendants posit that plaintiffs are estopped from challenging this Court's jurisdiction over the worker classification issue.  *See* Defs.' Opp. To Pls. Mot. Ruling Ct. Jurisdiction at 1-2, ECF No. 151.  The plaintiffs appear to have the better argument since Davis-Bacon Act sets out a comprehensive scheme for determining the rates at which employees are to be paid on "certain federal construction contracts," *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 756 (1981), and requires that disputes over the appropriate wage rate classification be resolved administratively within DOL, *see* 29 C.F.R. § 5.13 (describing as "authoritative," DOL's final determinations with respect to wage rates, "including the classifications therein"); *U.S. ex rel. Windsor v. DynCorp, Inc.*, 895 F. Supp. 844, 852 (E.D. Va. 1995) (holding that disputes about worker classifications "must be resolved by the Department of Labor").  Nevertheless, this Court need not resolve whether it has jurisdiction to determine the correctness of the plaintiffs' classification as carpenters, since the prevailing wage rate for carpenters under the Davis-Bacon Act would nonetheless apply here.

work?").  Sanz further testified that Carlos Calderon described the workers as carpenters to him. *Id.* at 102 (Carlos Calderon told Sanz "He just said I want to just send you carpenters, you know, to the job.").  Ten plaintiffs confirmed at trial, through live testimony and one plaintiff, who submitted testimony, that they were hired as carpenters and expected to be paid at that wage rate. *Id*. at 177–78 (testimony of Luis Rocha Moya); 215 (Wilson Perez Zapata), 260–61 (Juan Amurio Quiroz), 266 (Jose Lenin Rocha Quiroz), 306–08 (Javier Cespedes Becerra), 190, 195-96 (Peter Soto) 239 (Edgardo Terceros), 250-51 (Freddy Paz Perez), 292 (Jose Rocha Cespedes), 302-304 (Samuel Lopez), 575 (stipulation as to Jose Ramiro Perez).  Two other plaintiffs, Gerardo and Mario Moya, testified that they did solely finishing work.  *Id*. at 282-83 (testimony of Gerardo Moya); 273 (testimony of Mario Moya).[25]  Further, Calderon told the workers on two separate occasions that he would pay the workers and made no mention of paying the workers at less than the rate to which they believed they were entitled.  Trial Tr. at 374 (testimony of Jose Cespedes); *id.* at 122, 126-128 (testimony of Enrique Sanz); *id.* at 278-281 (Mario Moya). Indeed, after the plaintiffs left the Project site for nonpayment of their wages, CRC brought in substitute workers to do comparable work and those substitute workers were classified and paid as carpenters.  *Id.* at 133-134.

In the face of this overwhelming evidence that the eleven carpenter plaintiffs reasonably expected to be paid at the prevailing wage for carpenters, the CRC defendants have offered no evidence that this belief was either incorrect or unreasonable, or that this valuation of plaintiffs' labor was inconsistent with the value of the labor CRC and JCI actually received.

---

[25]    While there is some conflicting evidence in the record as to what work the Moyas performed, *see, e.g.,* Trial Tr. at 124 (Sanz testifying that Moyas did carpentry at the beginning and then finishing work stating "They carpenters"), the direct testimony of the Moyas is most persuasive on this issue.  *See id.* at 273 (Mario Moya responding "No" to being asked if he did "any other work" on the project other than finishing work); *id.* at 283 (Gerardo Moya testifying that "me and my brother['s]" work "entails drywall finishing" and that he did "finishing the entire time on the D.C. courts project").

In sum, the eleven carpenter plaintiffs are entitled to their expected wage of $33.88 per hour for their work, and $39.57 per hour for overtime work.  The two plaintiffs who testified that they worked solely as finishers, however, are not entitled to carpenter wages because they neither expected to be paid as carpenters nor did they do work that would merit carpenter wages.  They are, under the same logic, entitled to the rate at which a finisher would expect to be paid on the project, or $32.50 per hour and $36.96 per hour for overtime work.  J. Ex. 3 at APPENDIX 4 (setting wage rate for "drywall finisher[s]").  Using these wages and the unpaid hours plaintiffs worked, the Court calculates that the total amount in wage-related damages owed to the plaintiffs is $307,613.88, comprised of $153,806.94 in unpaid regular and overtime hours and an equal amount, $153,806.94, in liquidated damages, less the amount paid to the plaintiffs as a result of the settlement agreement, $100,014.54, for a total of $207,599.34 in damages.[26]  The computation of damages owed to each plaintiff is summarized below.

### (b) Damages For Each Plaintiff

Based on the parties' stipulations, *see* First Stips. ¶ 4, the findings of fact and the conclusions as to the applicable wage rates, the total unpaid wages and liquidated damages to which each plaintiff is entitled to recover from the defendants are summarized below.

### i.   Javier Cespedes

Plaintiff Javier Cespedes worked 403 straight time hours and no overtime hours, for a total of 403 hours, from April 23, 2011 to November 11, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the total hours by the wage rate of $33.38 per hour, Javier Cespedes should have been paid

---

[26]     The FLSA also requires a court to grant attorneys' fees to prevailing plaintiffs.  29 U.S.C.A. § 216 ("The court in [an FLSA] action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").  The parties are directed to submit to the Court a joint status report on whether agreement on the amount of attorneys' fees has been reached and, if not, a proposed schedule for briefing on this issue.

$13,452.14.  *See* Consolidated Summary Chart.  Javier Cespedes was paid $9,258.92, leaving

unpaid wages owed in the amount of $4,193.22.  This plaintiff is also entitled to liquidated

damages in an amount equal to compensatory damages, minus an offset for the $3,683.55

already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed

to Javier Cespedes of $4,702.89.

### ii.    Jose Cespedes Rocha

Plaintiff Jose Cespedes Rocha worked 963 straight time hours and 48 overtime hours, for

a total of 1011 hours, from May 7, 2011 to November 15, 2011.  J. Ex. 10; J. Ex. 12.

Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime

work, Rocha should have been paid $34,044.30.  *See* Consolidated Summary Chart.  Rocha was

paid $14,667.28, leaving unpaid wages owed in the amount of $19,377.02.  This plaintiff is also

entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for

the $13,963.30 already awarded to him under the DOL Settlement Agreement, resulting in a total

amount owed to Cespedes Rocha of $24,790.74.

### iii.    Samuel Lopez

Plaintiff Samuel Lopez worked 270 straight time hours and 8 overtime hours, for a total

of 278 hours, from August 12, 2011 to October 14, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the

total hours by the wage rate of $33.38 per hour and $39.57 per hour of overtime work, Lopez

should have been paid $9,329.16.  *See* Consolidated Summary Chart.  Lopez was paid $5,840.60,

leaving unpaid wages owed in the amount of $3,488.56.  This plaintiff is also entitled to

liquidated damages in an amount equal to compensatory damages, minus an offset for the

$2,042.67 already awarded to him under the DOL Settlement Agreement, resulting in a total

amount owed to Lopez of $4,934.45.

*iv.*     Gerardo Moya

Plaintiff Gerardo Moya worked 728 straight time hours and 96 overtime hours, for a total

of 824 hours, from July 9, 2011 to November 15, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the

total hours by the wage rate of $32.50 per hour and $36.96 per hour for overtime work, Gerardo

Moya should have been paid $27,208.16.  *See* Consolidated Summary Chart.  Gerardo Moya was

paid $10,235.44, leaving unpaid wages owed in the amount of $16,972.72.  This plaintiff is also

entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for

the $8,354.20 already awarded to him under the DOL Settlement Agreement, resulting in a total

amount owed to Gerardo Moya of $25,591.24.

*v.*     Luis Rocha

Plaintiff Luis Rocha worked 1055 straight time hours and no overtime hours, for a total

of 1055 hours, from April 9, 2011 to October 21, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the

total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Luis

Rocha should have been paid $35,215.90.  *See* Consolidated Summary Chart.  Luis Rocha was

paid $24,228.88, leaving unpaid wages owed in the amount of $10,987.02.  This plaintiff is also

entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for

the $9,442.80 already awarded to him under the DOL Settlement Agreement, resulting in a total

amount owed to Luis Rocha of $12,531.24.

*vi.*     Mario Moya

Plaintiff Mario Moya worked 736 straight time hours and 98 overtime hours, for a total of

834 hours, from July 9, 2011 to November 18, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the total

hours by the wage rate of $32.50 per hour and $36.96 per hour in overtime pay, Mario Moya

should have been paid $27,542.08.  *See* Consolidated Summary Chart.  Mario Moya was paid

$5,592.56, leaving unpaid wages owed in the amount of $21,949.52.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $13,917.41 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Mario Moya of $29,981.63.

### vii.    Freddy Paz Perez

Plaintiff Freddy Paz Perez worked 272 straight time hours and no overtime hours, for a total of 272 hours, from September 3, 2011 to October 21, 2011.  J. Ex. 10; J. Ex. 12. Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Paz Perez should have been paid $9,079.36.  *See* Consolidated Summary Chart.  Paz Perez was paid $2,954.56, leaving unpaid wages owed in the amount of $6,124.80.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $3,056.37 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Paz Perez of $9,193.23.

### viii.    Jose Ramiro Perez

Plaintiff Jose Ramiro Perez worked 136 straight time hours and no overtime hours, for a total of 136 hours, from September 3, 2011 to October 21, 2011.  J. Ex. 10; J. Ex. 12. Multiplying the total hours by the wage rate of $33.38 per hour, Ramiro Perez should have been paid $4,539.69.  *See* Consolidated Summary Chart.  Perez was paid $1,688.32, leaving unpaid wages owed in the amount of $2,851.36.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $1,523.78 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Ramiro Perez of $4,178.94.

### ix.   Wilson Perez-Zapata

Plaintiff Wilson Perez-Zapata worked 552 straight time hours and 30 overtime hours, for a total of 582 hours, from August 6, 2011 to November 15, 2011.  J. Ex. 10; J. Ex. 12. Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Perez-Zapata should have been paid $19,612.86.  *See* Consolidated Summary Chart. Perez-Zapata was paid $1,688.32, leaving unpaid wages owed in the amount of $17,924.54.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $11,945.46 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Perez-Zapata of $23,903.62.

### x.   Jose Lenin Rocha

Plaintiff Jose Lenin Rocha worked 759 straight time hours and 8 overtime hours, for a total of 767 hours, from April 9, 2011 to November 15, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Lenin Rocha should have been paid $25,651.98.  *See* Consolidated Summary Chart.  Lenin Rocha was paid $16,406.44, leaving unpaid wages owed in the amount of $9,245.54.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $4,769.97 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Lenin Rocha of $13,721.11.

### xi.   Juan Amurrio Quiroz

Plaintiff Juan Amurrio Quiroz worked 1127 straight time hours and 8 overtime hours, for a total of 1135 hours, from April 9, 2011 to November 18, 2011.  J. Ex. 10; J. Ex. 12. Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Quiroz should have been paid $37,935.82.  *See* Consolidated Summary Chart.  Quiroz was

paid $13,195.56, leaving unpaid wages owed in the amount of $24,740.26.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $16,064.48 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Quiroz of $33,416.04.

### xii.    Peter Soto

Plaintiff Peter Soto worked 623 straight time hours and 8 overtime hours, for a total of 631 hours, from July 16, 2011 to November 15, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Soto should have been paid $21,112.30.  *See* Consolidated Summary Chart.  Soto was paid $8,547.12, leaving unpaid wages owed in the amount of $12,565.18.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $8,633.17 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Soto of $16,497.19

### xiii.    Edgardo Pablo Terceros

Plaintiff Edgardo Pablo Terceros worked 262 straight time hours and 8 overtime hours, for a total of 270 hours, from August 6, 2011 to October 14, 2011.  J. Ex. 10; J. Ex. 12.  Multiplying the total hours by the wage rate of $33.38 per hour and $39.57 per hour for overtime work, Terceros should have been paid $9,062.12.  *See* Consolidated Summary Chart.  Terceros was paid $5,674.92, leaving unpaid wages owed in the amount of $3,387.20.  This plaintiff is also entitled to liquidated damages in an amount equal to compensatory damages, minus an offset for the $2,617.38 already awarded to him under the DOL Settlement Agreement, resulting in a total amount owed to Terceros of $4,157.02.

## B.       DEFENDANTS' CROSS-CLAIMS

The JCI and CRC defendants raise various cross-claims against each other arising from alleged failures to provide payment or services under the First and Second Subcontract, including breach of contract, indemnification, and contribution claims.  JCI further claims that the sub-subcontracts are not enforceable because they are illegal, unconscionable, subject to a unilateral mistake, or were obtained by way of bad faith or fraud.  The Court finds that the subcontracts between CRC and JCI are illegal and unenforceable as against public policy and that, as the parties are *in pari delicto*, the cross-claims should be denied as moot.

While the two subcontracts appear to be facially valid, the circumstances under which they were executed and the manner in which they were implemented renders them void for illegality, as enforcement of the subcontracts would be against public policy.  Illegal contracts will not be enforced, "not out of any regard for the defendant who sets it up, but only on account of the public interest."  *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77-78 (1982).  When a contract "arises out of circumstances that would lead enforcement to offend" a fundamental purpose of a remedial statute "the inquiry must be whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in" the statute.  *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 562-563 (1961).

Under District of Columbia law, which is applicable to the cross-claims between the defendants, "[i]t is a long-standing principle … that when parties have entered into an illegal contract, such contract is unenforceable and, typically, we leave the parties where we find them." *McMahon v. Anderson, Hibey & Blair*, 728 A.2d 656, 658-659 (D.C. 1999) (collecting cases); *see also Fields v. Hunter*, 368 A.2d 1156, 1158-1159 (D.C. 1977) ("The general rule is that an illegal contract, made in violation of a statutory prohibition designed for police or regulatory

purposes, is void and confers no right upon the wrongdoer." (quoting *Hartman v. Lubar*, 133

F.2d 44, 45 (D.C. Cir. 1942)); *accord Truitt v. Miller*, 407 A.2d 1073, 1079-1080 (D.C.

1979)(contracts "made in violation of a licensing statute designed to protect the public will

usually be considered void and unenforceable").  This fate of illegal contracts applies even when

the consideration proffered by each party is legal, but the means by which the parties intend to

fulfill the contract is illegal.  15-89 Corbin on Contracts § 89.2 ("A bargain may be improper by

reason of the wrongful purpose of one or both of the parties in making it.  This is true even

though the performances bargained for are not in themselves contrary to public policy and even

though the bargain would be valid and enforceable in the absence of the improper purpose.").

A party to an illegal contract may still be entitled to some form of relief, however, if that

party is not *in pari delicto*, that is, where the party does not bear "substantial fault for his injury"

as a result of "concurring in an illegal act."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472

U.S. 299, 307 (1985).  In contrast, when neither party to an unenforceable contract is blameless

but similarly at fault, they are *in pari delicto* and neither is entitled to any recovery since these

parties have forfeited their right to protection at law or in equity in the matter.  *United States v.

Farrell*, 606 F.2d 1341, 1348–49 (D.C. Cir. 1979) (noting under the doctrine of *in pari delicto*

"[n]either party to an illegal contract will be aided by the court, whether to enforce it or set it

aside.  If the contract is illegal, affirmative relief against it will not be granted, at law or in equity

. . ." (internal citation omitted)); *see also Official Comm. of Unsecured Creditors of Allegheny

Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 989 A.2d 313, 329 (Pa.

2010) (holding the doctrine of *in pari delicto* "requires the plaintiff be an active, voluntary

participant in the wrongful conduct or transaction(s) for which it seeks redress, and bear

substantially equal or greater responsibility for the underlying illegality as compared to the

defendant" (citation omitted)).  This denial of relief is premised on two grounds: "first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality."  *Bateman Eichler*, 472 U.S. at 306 (1985).

Three facts inform the Court's holding that the subcontracts are illegal and that their enforcement would be contrary to public policy.  First, the circumstances surrounding the formation of the subcontracts:  Carlos Calderon sought out Jose Cespedes to be his sub-subcontractor for the carpentry work on the Project, had him execute the First Subcontract without showing him the plans for the Project or the full scope of the work required, and encouraged him to execute the document written in English on the spot, even though Cespedes did not read or speak English and after Cespedes had already started work on the Project.  Trial Tr. at 324, 435-36.  Moreover, the evidence shows that Carlos Calderon intentionally tried to obfuscate the scope of the work required under the Subcontracts, going so far as to not show Jacinto Cespedes parts of the Project when offering him the job, Trial Tr. at 315, 383-84, and refusing to show Cespedes the plans for the Project, despite his requests, *id.* at 322 ("So then I asked him for the plans and he didn't want to give me the plans.); *id.* at 331 ("We had discussed this with Carlos Calderon already and he had said that he wasn't going to give us any of the plans… and there was more work to be done than anticipated.").  Nevertheless, the subcontracts required JCI to do almost all of CRC's work on the Project while only paying JCI approximately one quarter of the amount CRC was to receive under the Prime Subcontract.  Mem. & Order (Mar. 30, 2015) at 9, ECF No. 108.  This huge discrepancy between the monies to be paid under the First Subcontract and the Prime Subcontract shows that at the outset of the subcontracting relationship between CRC and JCI, CRC was setting up a situation in which JCI would likely be

unable to afford to pay for the labor to complete the full scope of the work.  Indeed, CRC claims

that the cost "to complete the work left to be finished" in November 15, 2011 was

"$200,879.96," CRC's COL at 10, an amount that is more than the *entire* sum CRC promised

JCI under the first contract, $191,099.10, J. Ex. 2 at 4, and barely less than the total CRC

promised to JCI under both subcontracts, $230,409.10.  J. Ex. 3 at 4.  CRC does not explain why

the cost of the remaining work on the project was almost equal to the total contract price

promised to JCI before the project began.

Second, both CRC and JCI engaged in accounting practices that were intended to

misrepresent work done in order to make CRC or JCI money.  Ana Calderon directed employees

to manipulate invoices and work progress orders with the intent to "keep for the company"

twenty percent, *id*. at 117, and CRC sent these incorrect invoices to the general contractor for the

purpose of underpaying its own subcontractor, *id.* at 116, 175 (Testimony of Enrique Sanz); *id.*

at 550 (Edgar Butler).  With the encouragement of the Calderons, Jacinto Cespedes also

reclassified his workers without any discussion with those employees of the work they did, *id.* at

345-47, and did so in order to pay them less than the amount to which they were legally entitled,

*id*. at 450-52.  After attempting to reclassify his employees without their knowledge for the

purpose of underpaying them, Cespedes then underpaid or failed to pay his workers for weeks of

work on the Project.  First Stips. ¶ 4 (parties stipulating as to which weeks Cespedes failed to pay

workers).  Even Edgar Butler feared that submission of the Certified Payrolls with incorrect

classifications of the workers would amount to fraud.  Trial Tr. at 555.

Third, with the encouragement of Carlos Calderon, Cespedes hired undocumented

workers to perform some of JCI's duties on the Project, which itself is illegal.  8 U.S.C. §

1324a(a)(1)(A) ("It is unlawful for a person . . . to hire . . . an alien knowing the alien is an

unauthorized alien . . . with respect to such employment."). Cespedes hired these workers with the intent to underpay them, Trial Tr. at 360, 362, and, with CRC's foreman's help, used other employees' badges to bypass screening mechanisms to sneak them onto the project site, *id*. at 414.

The multiple illegal means employed by both the JCI and CRC defendants, including underpayment and nonpayment of workers, altering information so that incorrect reports were submitted to the general contractor, unilateral re-classification of workers mid-job, hiring of undocumented workers, and sneaking unauthorized workers onto the Project site, all with the purpose of putting more money into their own pockets, brings the defendants' cross-claims within the doctrine of illegal contracts. To enforce the provisions of the Subcontracts against either party would amount to sanctioning this conduct, thereby encouraging deception on the part of federal contractors, and rewarding the underpayment of workers and the hiring of undocumented workers on federal construction projects.

For the same reasons, it is clear that the JCI defendants and the CRC defendants are *in pari delicto.* Even assuming that CRC had superior bargaining power, expertise in federal contracting, and knowledge of the Project, the JCI and CRC defendants were equal participants in the conduct that leads the Court to find the subcontracts unenforceable as against public policy. *See Farrell*, 606 F.2d 1348–49. These acts, which include among other things CRC's tactics around the formation of the subcontracts; CRC's intentional underpayment of JCI for its work; the JCI defendants' unilateral and unjustified reclassification of its workers and the CRC defendants' complicity in this action; the JCI defendants' hiring, again with the CRC defendants' complicity, of undocumented workers with the intent to underpay them; and JCI and CRC's attempts to sneak unauthorized individuals onto the Project site, all provide ample evidence that

the defendants were "voluntary participant[s] in the wrongful conduct" for which they seek redress, and that they "bear substantially equal . . . responsibility for the underlying illegality." *Allegheny Health Educ. & Research Found.*, 989 A.2d at 329.

Both the JCI and CRC defendants engaged in acts against public policy to increase their gain from the project, at the expense of the workers on the project, and they specifically targeted vulnerable individuals to exploit to save on labor costs.  All of these actions were taken in furtherance of the construction required under the contract, and given both parties' participation in these acts, the JCI and CRC defendants are *in pari delicto* and this Court will not lend its "good office[]" to "mediating disputes among [these] wrongdoers."  *Bateman Eichler*, 472 U.S. at 306 (1985).[27]

*  *  *

In sum, the Court holds that the First and Second Subcontracts between JCI and CRC are unenforceable, and because both parties are *in pari delicto* and are not entitled to relief at law or in equity from this Court, their cross-claims are denied as moot.  Thus, the parties are left as the Court found them.  *McMahon*, 728 A.2d at 658.

---

[27]       A further reason to deny the defendants any equitable relief is the doctrine of "unclean hands," which "closes the doors of a court of equity to one tainted with inequitableness or bad faith."  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see also Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 691 F. Supp. 2d 132, 159 (D.D.C. 2010) ("Unclean hands is an equitable doctrine committed to the Court's discretion.").  "Courts have discretion to deny equitable relief where there is a direct link between plaintiffs' unethical behavior and the underlying obligation that formed the basis of the lawsuit." *Monument Realty LLC v. Washington Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 82 (D.D.C. 2008).  The unethical behavior at issue here is directly related to the performance of the subcontracts and, therefore,  for the same reasons that the Court finds the subcontracts are unenforceable as against public policy and that the defendants are *in pari delicto*, the Court finds that the defendants have unclean hands and declines to grant them any equitable relief.

**IV.     CONCLUSIONS**

The foregoing findings of fact and conclusions of law entitle the plaintiffs to recover their unpaid wages, as well as statutory liquidated damages in an amount equal to their unpaid wages and reasonable attorneys' fees.  Since the CRC and JCI defendants were plaintiffs' joint employers, and Travelers' liability is coextensive with that of CRC, all defendants are joint and severally liable for payment of the unpaid wages, liquidated damages and reasonable attorneys' fees.  The parties are directed to submit to the Court, by January 13, 2017, a joint status report on whether an agreement on the amount of attorneys' fees has been reached and, if not, a proposed schedule for briefing on this issue.

The cross-claims between the JCI and CRC defendants are denied as moot since enforcement of the two subcontracts between the defendants would be contrary to public policy.

Date:  December 22, 2016

_____

BERYL A. HOWELL
Chief Judge